Filed 2/25/14  P. v. Dean CA2/7
## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MESHA ARSHAZ DEAN,<br><br>        Defendant and Appellant. | B240514<br><br>(Los Angeles County<br>Super. Ct. No. GA062947)<br><br>ORDER MODIFYING OPINION<br>(NO  CHANGE IN JUDGMENT) |

THE COURT:

IT IS ORDERED that the opinion filed herein on February 4, 2014, be modified as follows:

On page 8, in the last sentence of the first full paragraph, delete the language:

"then drove to Kansas, where they"

As modified, the sentence should read:

"They were arrested two days later."


The foregoing does not change the judgment.

_____

PERLUSS, P. J.                                WOODS, J.                                ZELON, J.

Filed 2/4/14  P. v. Dean CA2/7 (unmodified version)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B240514 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA062947) |
| v. | |
| MESHA ARSHAZ DEAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lance A. Ito, Judge.  Affirmed.

Carla Castillo, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General; Dane R. Gillette, Chief Assistant Attorney General; Lance E. Winters, Senior Assistant Attorney General; Lawrence M. Daniels, Supervising Deputy Attorney General; and Allison H. Chung, Deputy Attorney General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Vanessa O. and defendant Mesha Dean drove to California with the intent to take Vanessa's four-year old son from his father and transport the child to Nevada. When Vanessa and Dean arrived at the father's residence, the child's uncle, Monty M., attempted to stop Vanessa from placing the child in Dean's car. During an ensuing altercation, Dean shot Monty, who died from his injuries. Dean and Vanessa fled with the child and were arrested in Kansas two days later. The Los Angeles County District Attorney filed an information charging Dean with murder (Penal Code, § 187, subd. (a)),[1] felony child endangerment (§ 273, subd. (a)) and kidnapping (§ 207, subd. (a).) Dean was tried by jury and convicted on all counts.

On appeal, Dean argues there was insufficient evidence to convict her of felony child endangerment. She further alleges that the trial court committed instructional and evidentiary errors, and imposed multiple punishments for the single act of shooting Monty in violation of section 654. We affirm.

## FACTUAL BACKGROUND

### A.    *Summary of Events Preceding Dean's Trial*

Mark M. and Vanessa O. were living together in Altadena, California when Vanessa gave birth to their son, M.M. Two years later, the family moved to an apartment located near Las Vegas, Nevada. In 2006, Vanessa informed Mark she was in a relationship with another woman and wanted him to move out of the apartment. Mark decided to move back to California to live with his parents. Mark and Vanessa agreed that M.M., who was then four years old, should temporarily reside with Mark at his parents' home.

In March of 2007, Vanessa devised a plan to take M.M. from Mark and transport the child back to Nevada. Vanessa told her girlfriend, defendant Mesha Dean, about her plan. Dean agreed to drive Vanessa to California. Vanessa and Dean left Nevada on the

_____

[1]    Unless otherwise noted, all statutory citations are to the Penal Code.

evening of Friday, March 16, 2007. During the drive, Vanessa called Mark and informed him that she wanted to visit with M.M. Mark agreed that he and M.M. would meet Vanessa at a local park the next day. The following morning, Vanessa told Mark she would call him when she arrived at the park; Mark, however, never received the call and became suspicious of Vanessa's motives. Shortly thereafter, Mark decided to drive to Nevada to help a friend recover a towed vehicle. He left M.M. in the care of his brother, Monty M., and his parents, Monroe and Sylvia M.

The next morning, Sunday, March 18, Vanessa and Dean drove to the home of Mark's parents. Vanessa instructed Dean to park the car down the street and wait outside while she attempted to get the child. Monty answered the door and invited Vanessa inside the house to visit with M.M. While Vanessa was playing with the child, Monty became suspicious that Dean was waiting outside. Monty left the house to confront Dean and Vanessa followed him with M.M. When Dean saw Monty and Vanessa walk into the street, she drove the car toward them. Vanessa, who was holding M.M., attempted to enter the passenger side of the vehicle. Monty tried to stop Vanessa, and an altercation ensued. Vanessa heard two gun shots and saw Monty fall into the street. Vanessa and Dean immediately drove away with M.M. When officers arrived at the home of Mark's parents, they found Monty bleeding in the street; he was transported to a hospital where he died from gunshot wounds. Two days later, Dean and Vanessa were arrested while traveling in a car with M.M. in the state of Kansas. Vanessa admitted to authorities that Dean had shot Monty.

On November 16, 2007, the Los Angeles District Attorney's office filed an information charging Dean and Vanessa with three counts: (1) murder (§ 187, subd. (a)); (2) felony child endangerment (§ 273, subd. (a)); and kidnapping (§ 207, subd. (a).) The information included special allegations asserting that Dean had personally and intentionally discharged a firearm in the commission of each offense, resulting in great bodily injury and death. Vanessa eventually pleaded guilty to voluntary manslaughter, child endangerment and kidnapping. Dean, however, elected to proceed to trial.

### B. *Summary of Evidence at Dean's Trial*

#### 1. *Testimony of Mark M.*

At trial, Mark M. testified that, after moving from California to Nevada in 2004, he and Vanessa began having problems in their home life. In December of 2006, Mark decided to end the relationship after Vanessa informed him she had started seeing someone else. On December 24, 2006, Vanessa met with Mark and his parents in Nevada. During the meeting, Vanessa agreed to allow M.M. to reside with Mark at his parents' house in California. According to Mark, Vanessa agreed M.M. should continue living in California until she had sufficient financial resources to care for the child. After the December 24th meeting, Mark transported most of M.M.'s belongings to his parents' house and enrolled the child in school.

In January of 2007, Mark visited Vanessa in Nevada and discovered that Dean, who described herself as a rapper, had moved into Vanessa's apartment. During a subsequent visit, Mark saw a firearm at the apartment that "he had never seen there before." Mark was concerned about M.M. "being around someone who had a gun" and expressed his concerns to Vanessa.

On Friday, March 16th, 2007, Vanessa called Mark to inform him she was traveling to California and wanted to see M.M. Vanessa asked Mark to bring M.M. to her aunt's house in San Bernardino. Vanessa assured Mark that Dean was not traveling with her and did not disclose that she intended to take M.M. back to Nevada. Mark told Vanessa he was willing to bring M.M. to Vanessa's aunt's house, but would not allow the child to stay there overnight. He also insisted on being present when Vanessa visited with the child. When Mark was asked why he did not want to leave M.M. alone with Vanessa, he explained that he "did not trust anything about [Vanessa] at that point."

Vanessa later called Mark back and asked whether she could pick up M.M. from his house. Mark suggested that they meet the next day, Saturday, March 17th, at a park located near his parents' house. According to Mark, the "arrangement" they had agreed upon was for Vanessa to "see her son, spend some time with him [at the park] while I was there watching . . . and that was it." On the morning of Saturday, March 17th,

Vanessa told Mark she would call him when she arrived at the park. Mark, however, never received a call.

At some point on that Saturday, Vanessa's aunt called Mark and told him that Dean was traveling with Vanessa. The aunt also told Mark she "pretty much thought [Vanessa] was up to something," but did "not know exactly what." Mark became concerned about "[Vanessa's] intentions" and decided to travel to Nevada to help a friend recover a towed vehicle. Prior to leaving his parents' house, Mark drafted and signed a letter authorizing his brother Monty and his parents to make any decisions related to M.M's care and custody.

Mark did not return from Nevada until the night of Sunday, March 18. Upon his return, he was informed that his brother Monty had been shot and that Dean and Vanessa had taken M.M.

### 2. *Testimony of Vanessa O.*

Vanessa O. testified that her relationship with Mark began to deteriorate after they moved to Nevada. In November of 2006, Vanessa took a job at Credit One Bank, where she met Dean and started a relationship with her. Approximately one month later, Vanessa told Mark she had "'found someone else'" and wanted Mark to move out of their apartment. On December 24, 2006, Vanessa agreed to allow Mark's father, Monroe, to take M.M. to California for a two week period. According to Vanessa, Monroe assured her he would return M.M. to Nevada as soon as Vanessa found a "sitter" to care for the child during the workday.

In January of 2007, Vanessa quit her job at the Credit Bank. The following month, she was evicted from her apartment for failure to pay rent and moved into a house with Dean and "three or four" other people. Vanessa testified that, during the time she lived with Dean, she had never seen Dean in possession of a firearm. Vanessa also denied ever speaking with Mark about the presence of a firearm in her residence.

Between January and March of 2007, Vanessa repeatedly requested that Mark bring M.M. back to Nevada. Vanessa stated that she had phone conversations with Mark

"nearly every day" asking that he return M.M. Vanessa admitted that, on several occasions during this time period, Mark's mother invited her to visit the child in California, but asserted she had no way of getting there. Vanessa also admitted that she never sought any sort of custody order.

In March of 2007, Vanessa devised a plan to travel to California and "take [M.M.] without Mark's permission" and bring him back "to live" with her in Nevada. Vanessa testified that she planned to ask Mark to bring the child to her aunt's house in San Bernardino and then transport the child back to Nevada without Mark's permission or knowledge. Vanessa chose not to tell Mark that she intended to take M.M. back to Nevada because she did not believe he would allow her to do so. Vanessa told Dean about her plan, and Dean agreed to drive her to California.

Vanessa and Dean left Nevada on the evening of Friday, March 16, 2007, and arrived at her aunt's house later that night. During the drive, Vanessa called Mark to "make arrangements for him to come to [her] aunt's house [with M.M.]." The next morning, however, Vanessa's aunt forced her to leave the house after discovering she was traveling with Dean. Vanessa called Mark to report that they could no longer meet at her aunt's house; she suggested that they meet at a park located near his house. Vanessa explained that she planned to meet Mark in the park and then immediately walk M.M. back to the car and drive away with him back to Nevada.

Before going to the park, Vanessa called the Pasadena police to make sure she could "pick[] up [her] son without getting in trouble." During the call, which was recorded and played back at the trial, Vanessa informed the police dispatcher that she wanted to "get [her] son from [his] father" and explained that neither parent had a custody order. Vanessa asked the dispatcher if there was anything the police could "do" if she were to travel to the father's house and take the child. The dispatcher suggested that Vanessa contact the Altadena police and request the presence of a "'keep the peace'" officer. The dispatcher also told Vanessa she could not "just go over there and get him" because the father would "probably call the police. So most likely . . . it's just best to get the police . . . from the very get go."

6

Vanessa then called the Altadena police and informed the dispatcher she was trying to get her son from his father and wanted to "know the process . . . of trying to get him." The dispatcher informed Vanessa that, without a custody order, the police would not be able to assist her. In response, Vanessa stated: "Okay, but, I can just get him anyways. . . if I just take him . . . you guys can't do nothing, he can't do nothing about it is that right?" The dispatcher stated "Correct," and Vanessa immediately ended the conversation.

After speaking with the police, Vanessa traveled to the park and called Mark's home phone. Mark's brother Monty answered the phone and told her Mark was not home. Vanessa and Dean then traveled to Mark's parents' house to investigate whether Mark was there. Vanessa did not see Mark's car and left the area. Vanessa and Dean slept in the car on Saturday night and then drove back to Mark's parents' house the next morning. When they arrived, Vanessa told Dean to park down the street because she did "not want a confrontation between [Dean] and the family." Although Vanessa intended to take M.M. from the house and transport him back to Nevada, she had no specific plan as to how she was going to get him out of the house.

Vanessa approached Mark's parents' home and knocked on the front door. Monty answered the door and invited her inside to visit with M.M. After several minutes, Monty asked Vanessa if "that bitch [Dean] was outside"; Vanessa told Monty Dean was not with her because she "did not want any type of confrontation." Monty, however, became suspicious and stated that he would "blast" Dean if he found her waiting outside. Monty became increasingly agitated and eventually went out the front door and walked into the street. Vanessa picked up M.M. and followed Monty outside the house.

When Monty reached the street, Dean drove her vehicle forward and stopped directly in front of him. According to Vanessa, Monty began threatening Dean and then "went over to [the driver-side door] to try to get at her, but [Dean] . . . locked the doors." When Vanessa attempted to enter the passenger side of the car with M.M., Monty told her she was "not taking his nephew" and began pulling her hair and hitting her on the

7

side of the head. Monty then pushed past Vanessa and M.M., who were then inside the car, and tried to "get at" Dean. Monty snapped a necklace from Dean's neck and started hitting her on the right side of the face.

Vanessa, who was then sitting in the front seat holding M.M., heard two gunshots. At the time she heard the shots, she could feel Monty "inside the car," positioned directly "by [her] side." Vanessa confirmed that her son was "right there inside of the car when [Dean] pulled out [the] gun and . . . shot [Monty]." After hearing the gunshots, Vanessa saw Monty fall "outside the car" and shut the door. Dean then turned the car around and started driving away from Mark's parents' house. Vanessa and Dean immediately drove back to Nevada and washed out the car. They then drove to Kansas, where they were arrested two days later.

Following their arrest, Vanessa told Los Angeles Deputy Sherriff Beth Smith that Dean had shot Monty, but claimed that there was another person in the vehicle named "Chuck" who had brought the firearm. Vanessa later admitted to Deputy Smith that she and Dean had fabricated the "Chuck" character "so that it did not look like [Dean] brought her gun with her from Vegas to come get [M.M.]." Vanessa eventually pleaded guilty to voluntary manslaughter, kidnapping and child endangerment. As part of her plea deal, she agreed to provide a full, truthful statement to the police.

### 3. *Testimony of Terrell Hooper*

Terrell Hooper, who identified himself as a close friend of Vanessa, testified that he had met Vanessa while working at Credit One Bank. Hooper stated that, at some point after Mark moved back to California, Dean moved into Vanessa's Nevada apartment. Hooper further stated that, when visiting Vanessa's apartment, he frequently saw Dean cleaning a firearm. According to Hooper, he saw Dean with the firearm "every time he was over there," which occurred "three or four days a week."

### 4. *Testimony of investigating officers and the crime scene reconstruction expert*

Several law enforcement personnel who had participated in the investigation also testified at trial. Deputy Sherriff Elizabeth Smith testified that she interviewed and

8

examined Dean and Vanessa shortly after they were arrested. According to Smith, Dean did not have any visible injuries on her head or neck; the only visible injury on Vanessa was a "mark on [her] cheek" that was caused by a car crash that occurred "at the time of the arrest." Deputy Smith also reported that prison guards had intercepted several notes Dean had tried to pass to Vanessa shortly after their arrest. In one note, Dean instructed Vanessa to "remember" that "Chuck" had been with them at the time of the shooting; in a second note, Dean stated "I hope that when you gave that statement you didn't' tell them that I brought the *** because that is going to get me life."

Los Angeles County Deputy Sherriff Dina Black testified that, in April of 2007, she traveled to a Nevada detention facility to pick up Dean to return her to California. Smith stated that, when she arrived at the facility, she was provided a locker containing Dean's property. Smith looked through the belongings and found a handwritten note that contained what appeared to be rap lyrics stating, in part: ""I'm sending niggers to school and giving classes in fashion, and seeing a man die is one of my favorite lessons . . ."

Los Angeles Deputy Sherriff Christopher Stokes testified that he traveled to the home of Mark's parents after receiving a report that gun shots had been fired and that a person was down. When Deputy Stokes arrived, he found Monty lying in the street "in a pool of blood." Although Monty was alive, he could "not really speak because blood kept spurting out his neck and mouth." According to Stokes, each time Monty's heart beat, blood sprayed "a distance" from his body.

Sean Yoshii, a criminalist at the Los Angeles County Sheriff's Department, testified that he had been assigned to examine the car that Dean and Vanessa had driven from California to Kansas. Yoshii explained that he searched the interior of the vehicle with "luminol," which he described as a chemical agent that "bring[s] up bloodstains that you can't see with the naked eye." Yoshii did not find any evidence of blood inside the car. Although Yoshii acknowledged luminol might not be able to detect blood in an area that had been "thorough[ly] cleaned," he further explained that it would be extremely difficult to remove every trace of blood from the vehicle.

The prosecution also called Paul Delhauer, who had formerly worked at the Los Angeles County Sheriff's Department, to testify as a crime scene reconstruction expert. Delhauer testified that, based on his review of the evidence, he did not believe Monty was in the vehicle at the time he was shot. Delhauer explained that, based on the alignment of Monty's entry wounds, the absence of any blood in the car, the blood spatter patterns outside the car and and the lack of soot near the entry wounds, there was "absolutely no way to conceive of how [Monty] would have been in a position where the injuries could have occurred from . . . inside the car."

### C. *Jury Verdict and Sentencing*

The jury found Dean guilty of murder in the second degree (count one), felony child endangerment (count two) and kidnapping (count three). The jury also found true special allegations that Dean had personally and intentionally discharged a firearm in the commission of each count, resulting in great bodily injury and death to Monty. On count three, the jury further found that the victim was "under the age of 14 year, and the defendant was not a biological parent, an adoptive parent, or a person granted access to the victim by court order . . ."

The trial court sentenced Dean to a term of 40 years to life in prison on the murder count, which consisted of a 15 years to life term for the murder, plus an additional 25 years to life firearm enhancement pursuant to section 12022.53, subdivision (d). The court imposed the middle term of eight years in prison on the kidnapping count (see § 208, subd. (b)) and 16 months in prison (one-third the midterm) on the child endangerment count. The court further directed that the sentences on counts two and three were to be served consecutive to the sentence imposed on count one, resulting in a total sentence of 49 years and four months to life in prison.[2] Dean filed a timely appeal.

---

[2] The court also imposed firearm enhancements on counts two and three, but stayed the enhancements pursuant to section 654.

10

Dean raises four issues on appeal. First, she contends there was insufficient evidence to convict her of felony child endangerment. Second, she argues the trial court erred in instructing the jury on the crime of kidnapping. Third, she argues the court erred in permitting the prosecution to introduce two pieces of evidence at trial: the testimony of Terrell Hooper and the rap lyrics Deputy Black recovered at the Nevada detention facility. Fourth, Dean contends that the trial court violated Penal Code section 654 by imposing a consecutive, 16-month prison term on the count of felony child endangerment.

### A. *Substantial Evidence Supports Dean's Conviction for Felony Child Endangerment*

Dean argues there was insufficient evidence to support her conviction for felony child endangerment (§ 273a, subdivision (a).) "'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

Section 273a, subdivision, (a), frequently referred to as felony child abuse or felony child endangerment, is an "omnibus statute" that is "intended to protect a child from an abusive situation in which the probability of serious injury is great." (*People v. Valdez* (2002) 27 Cal.4th 778, 783 (*Valdez*).) As relevant here, the statute "provides:

'Any person who, under circumstances or conditions likely to produce great bodily harm or death, [1] willfully causes or permits any child to suffer, or [2] inflicts thereon unjustifiable physical pain or mental suffering, or [3] having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or [4] willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years.' [Citation.]" (*Id.* at p. 783.)

The four categories of conduct set forth in section 273a(a) "broadly include[] both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect." [Citation.]" (*Valdez, supra,* 27 Cal.4th at p. 784.) Our Supreme Court has clarified that different means reapply under section 273a(a) depending on the manner in which the defendant has allegedly violated the statute. In "direct infliction" (direct assault) cases, "the appropriate mens rea . . . is general criminal intent" (*In re L.K.* (2011) 199 Cal.App.4th 1438, 1445 (*L.K.*)), meaning "the intent to perform the underlying injurious act on a child." (*Valdez, supra,* 27 Cal.4th at p. 786.) In "indirect infliction" (endangerment) cases, "the necessary mens rea . . . is criminal negligence." (*L.K., supra,* 199 Cal.App.4th at p. 1445.)

In this case, the prosecution argued Dean violated the fourth prong of section 273a, subdivision (a) by willfully causing or permitting M.M. to be placed in a situation where his health was endangered under circumstances likely to produce great bodily harm or death. More specifically, the prosecution asserted Dean committed felony child endangerment as a direct perpetrator when she discharged her firearm in close proximity to the child. The prosecution's alternative theory was that Dean aided and abetted Vanessa in the commission of child endangerment when she discharged the weapon. (See *People v. Culuko* (2000) 78 Cal.App.4th 307, 334 (*Culuko*) [defendant may be convicted of violating section 273a, subdivision (a) as either a "perpetrator" or an "aider and abettor"]; *People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117 ["All persons concerned in the commission of a crime, . . . whether they directly commit the act

12

constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed"].)  The jury was instructed on both theories of criminal liability.

On appeal, Dean contends that, to convict her of violating the fourth prong of section 273a(a) as a direct perpetrator, the prosecution was required to prove she had "care and custody" of M.M. at the time she endangered the health of the child. According to Dean, the prosecution failed to make any such showing because there was no evidence M.M. was ever in her custody or care; instead, the evidence showed Vanessa was in control of the child and was the party responsible for placing him into the car where the weapon was discharged.

Even assuming Dean is correct that the fourth prong of section 273a(a) requires a direct perpetrator to have "care and custody" of the child, she does not dispute "there is no such requirement as to an aider and abettor." (*Culuko, supra*, 78 Cal.App.4th at p. 334 ["even assuming felony child abuse required in this case that the perpetrator have care and custody, there is no such requirement as to an aider and abettor"]; see also *People v. Fraize* (1995) 36 Cal.App.4th 1722, 1725 ["[U]nder an aiding and abetting theory . . . a defendant can properly be convicted of a crime even though by statutory definition the defendant would be incapable of committing the substantive offense by himself."].) Thus, even in the absence of evidence showing Dean had care and custody of M.M., we may affirm her conviction if there is substantial evidence that she aided and abetted Vanessa in the commission of child endangerment.  Dean contends, however, that her "conviction cannot be upheld on an aiding and abetting theory because there is no evidence [Vanessa] acted with criminal negligence by placing [M.M.] in a situation where she reasonably could have known he was at risk of death or great bodily injury." Dean essentially asserts there was insufficient evidence to show Vanessa should have reasonably known that placing M.M. into the car under the circumstances then present placed the child at substantial risk of great bodily harm.  We disagree.

Criminal negligence "goes beyond that required for civil liability." (*People v Peabody* (1975) 46 Cal.App.3d 43, 47)  "'The negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what

13

would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.'" (*People v. Penny* (1955) 44 Cal.2d 861, 879; *Williams v. Garcetti* (1993) 5 Cal.4th 561, 573-574.) "'Under the criminal negligence standard, knowledge of the risk is determined by an objective test: "[I]f a reasonable person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness."' [Citations.]" (*People v. Felton* (2004) 122 Cal.App.4th 260, 269-270 (*Felton*).)

The prosecution presented substantial evidence that a reasonable person in Vanessa's position would have known her conduct–carrying M.M. into Dean's vehicle during an altercation with Monty–endangered the child's health under circumstances or conditions likely to produce great bodily harm or death. First, the evidence showed that Vanessa intended to remove M.M. from Mark's residence despite her belief that Mark's family would try to stop her. She was also aware that Dean's presence at the house was likely to exacerbate the situation. When Vanessa arrived at the residence, she specifically told Dean to stay outside because she wanted to avoid a confrontation with family members. Once inside the house, she told Monty that Dean was not present because she "didn't want any type of confrontation."

Second, Vanessa's testimony at trial demonstrated she had concerns about Monty's temperament and was afraid he might try to hurt Dean. Vanessa stated that she had previously seen Monty go on "rant[s]" where he became "really angry" and was "very hard to calm down." After Vanessa was invited into the house to visit M.M., Monty repeatedly referred to Dean as "that bitch" and threatened to "blast her" if he found her waiting outside. When Monty finally exited the house to investigate whether Dean was present, he was "really upset, ranting and raving." Vanessa admitted that, based on Monty's behavior and statements, she believed he might actually try to "blast" Dean.

Third, the evidence showed that, despite her concerns about a potential conflict between Dean and Monty, Vanessa chose to follow Monty outside the house while

14

holding M.M. As Monty approached Dean's car, Vanessa saw him "threaten" Dean and try to "get at her" through the driver side door. Vanessa also heard Monty tell her he would not allow her to "tak[e] [his] nephew"; Vanessa, however, ignored these warnings and began to enter the passenger side of the car with M.M.

Fourth, the prosecution introduced evidence suggesting Vanessa knew or should have known Dean was likely to be in possession of a firearm. Although Vanessa testified she had never seen Dean with a firearm at any point before the date of the shooting, Vanessa's friend, Terrell Hooper, testified that "every time" he visited Vanessa's apartment – which occurred three or four times a week–he saw Dean cleaning and handling a firearm. Similarly, Mark testified he had expressed concerns to Vanessa about M.M. living in a residence where a firearm was present. The prosecution also introduced evidence that, after being arrested, Dean tried to pass a note to Vanessa stating: "I hope that when you gave that statement you didn't tell them that I brought the *** because that is going to get me life." During a post-arrest interview with law enforcement, Vanessa admitted she had initially fabricated a story alleging that a third-party in the car had provided Dean with the firearm "so that it did not look like the defendant brought her gun with her from Vegas to come get [M.M.]."

In sum, there was substantial evidence that: (1) Vanessa traveled to Mark's house knowing that the family would not willingly permit her to take the child and that Dean's presence was likely to exacerbate the situation; (2) while inside the house, Vanessa heard Monty make statements that caused her to believe he would try to harm Dean if he found her waiting outside the house; (3) Vanessa elected to bring the child with her into the street, thereby exposing the child to the ensuing conflict between Dean and Monty; (4) after hearing Monty threaten Dean and state that he would not allow the child to be taken, Vanessa attempted to enter the passenger side of the vehicle while holding M.M.; and (5) Vanessa knew or should have known Dean had a firearm in the car. Based on this evidence, the jury could rationally infer that a reasonable person would have known that carrying M.M. into Dean's car placed the child at substantial risk of great bodily harm. (*Felton, supra,* 122 Cal.App.4th at pp. 269-270.)

15

Dean also asserts, that even if the jury could have properly inferred Vanessa acted with criminal negligence, there was insufficient evidence that M.M. was ever placed at risk of harm under conditions that were likely to result in great bodily injury or death. According to Dean, "there was insufficient evidence to prove this essential element because there was no evidence [M.M.] was at any risk of being shot when Dean pointed her gun at [Monty] . . . . The prosecutor presented no evidence the gun was fired in a manner that there was a probability M.M. would also be shot." The evidence at trial, however, showed that, while sitting in the driver's seat, Dean fired her pistol toward Monty, who was either in the passenger side of the car or standing directly outside the passenger side of the car. At the time the shots were fired, Vanessa was holding M.M. in the passenger seat; Vanessa specifically testified said she could feel Monty by her side when she heard the shots. Moreover, the prosecution introduced evidence that, after her arrest, Dean told a third party she was not aiming the pistol when she pulled the trigger, but merely pointing in the general direction of Monty. This evidence "was sufficient to support the jury's determination that the totality of the circumstances and conditions were likely to produce great bodily harm [or death]" to the child. (See *People v. Clark* (2011) 201 Cal.App.4th 235, 245.)

### B. The Trial Court Did Not Err in Instructing the Jury on Kidnapping

Dean argues the trial court committed two errors when instructing the jury on the crime of kidnapping. First, she asserts the court should have instructed the jury that, under California law, a parent may not be convicted of kidnapping his or her biological child. Second, she contends the court had a sua sponte duty to instruct the jury that mistake of fact was a defense to kidnapping.

#### 1. Under California law, a parent may be convicted of kidnapping his or her biological child

Dean argues the trial court erred by failing to instruct the jury that a person cannot be convicted of kidnapping his or her biological child. Dean contends that, as a result of this instructional error, the jury was invited to convict her of kidnapping under an

16

"invalid" legal theory: aiding and abetting Vanessa in the kidnap of her son M.M. Although Dean does not dispute there was sufficient evidence to convict her "on the valid theory of kidnapping [M.M.] as a direct perpetrator," she argues that her conviction must be reversed because "it is impossible to determine" whether the jury properly found her guilty as a direct perpetrator, or improperly found her guilty of aiding and abetting Vanessa in the kidnap of M.M.

Penal Code section 207, which describes the offense of kidnapping, does not include any language supporting Dean's contention that California law precludes a parent from being convicted of kidnapping his or biological child. Subdivision (a) of the statute states: "(a) Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." Subdivision (e) defines the amount of force necessary to kidnap an unresisting child: "For purposes of those types of kidnapping requiring force, the amount of force required to kidnap an unresisting infant or child is the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent."

Under subdivisions (a) and (e) of section 207, a parent entitled to custody of his or her child "is liable for kidnapping if he or she exercises custodial rights for an illegal purpose." (*People v. Senior* (1992) 3 Cal.App.4th 765, 781; *People v. Jones* (2003) 108 Cal.App.4th 455, 462-463 ["it has been recognized that where the prosecution proves this unlawful purpose element, a parent who has rightful custody of his or her child may be convicted of kidnapping the child]"].) In this case, the prosecution alleged Dean and Vanessa committed kidnapping by taking M.M. from Mark's home with the illegal purpose of committing child abduction in violation of section 278.5.[3] Dean does not dispute there was sufficient evidence to prove Vanessa took M.M. with this illegal

---

[3] Section 278.5 states in part: "(a) Every person who takes, entices away, keeps, withholds, or conceals a child and maliciously deprives a lawful custodian of a right to custody, or a person of a right to visitation, shall be punished . . ."

purpose; she contends only that such conduct did not qualify as a kidnapping for the purposes of section 207 because Vanessa was M.M.'s mother. The language of section 207, however, simply does not include a "parental" exception. Indeed, subdivision (f) of the statute specifically lists various forms of conduct that are excepted from section 207 (namely, lawful arrests by law enforcement and private citizens), but does not include any exception related to parents.

Dean, however, asserts that we should read a parental exception into the statute based on language in section 208, which describes the punishment for the crime of kidnapping. The section states in part: "(a) Kidnapping is punishable by imprisonment in the state prison for three, five, or eight years. [¶] (b) If the person kidnapped is under 14 years of age at the time of the commission of the crime, the kidnapping is punishable by imprisonment in the state prison for 5, 8, or 11 years. This subdivision is not applicable to the taking, detaining, or concealing, of a minor child by a biological parent, a natural father, . . , an adoptive parent, or a person who has been granted access to the minor child by a court order." According to Dean, section 208 demonstrates "[t]he Legislature has specifically excluded parent from punishment for child kidnapping. . . . Therefore [Vanessa], as the biological parent of [M.M.], could not be convicted or punished for child kidnapping . . . [and] Dean could not convicted of aiding and abetting her."

Section 208, subdivision (b) does not exclude the taking of a child by a biological parent from the definition of kidnapping. The subdivision merely directs that: (1) an enhanced punishment applies to the crime of kidnapping if the person kidnapped is under 14 years of age; and (2) the enhanced punishment does not apply if the defendant is the victim's biological or legal parent. Section 208 effectively confirms the Legislature did not intend to provide a parental exception to the crime of kidnapping set forth in section 207. If a parent could not be convicted of kidnapping under section 207, there would have been no need for the Legislature to have included a provision explaining that the

18

enhanced penalty under section 208, subdivision (b) does not apply to the taking, detaining, or concealing, of a minor child by a biological parent.**4**

Because we reject Dean's contention that a parent may not be convicted of kidnapping his child under section 207, we find no error in the trial court's instruction.

### 2. *The Trial Court Was Not Required to Provide an Instruction on the Defense of Mistake*

Dean also contends the court erred by failing to instruct the jury that mistake of fact is a defense to the crime of kidnapping. According to Dean, the court had a sua sponte duty to instruct on the defense of mistake of fact because the jury could have reasonably inferred Dean a good faith belief Vanessa was legally entitled to take M.M. from Mark's house and transport the child back to her home in Nevada. For the purposes of appeal, we will assume that, if proven, Dean's mistaken belief that Vanessa had a legal right to detain her child from Mark would provide a defense to the crime of kidnapping.

"'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.'" (*People v. Anderson* (2011) 51 Cal.4th 989, 996 (*Anderson*).) Generally, the court's sua sponte instructional duty "extends to defenses . . . . 'if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' [Citation.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 157 (*Breverman*).) However, "'when a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking sua sponte instructional duties." (*Anderson, supra*, 51 Cal.4th at p. 996.)

---

**4**     Dean contends the legislative history supports her assertion that section 208 was intended to create a parental exception to the crime of kidnapping set forth in section 207. Because the language of sections 207 and 208 are unambiguous on this issue, the legislative history is immaterial. Accordingly, we deny Dean's March 1, 2013 request for judicial notice of legislative history documents. (See *Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 888, fn. 8 [denying request for judicial notice of legislative history because statute was "unambiguous"].)

19

In *Anderson, supra*, 51 Cal.4th 989, the California Supreme Court considered whether trial courts have a sua sponte duty to instruct on the defense of accident, which is codified in Penal Code section 26: "All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Five – Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence."  The Supreme Court concluded that although traditionally characterized as a "'defense,'" the "'claim that a [crime] was committed through misfortune or accident "amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime."'" (*Id.* at p. 997.)  The Court further concluded that because the "defense of accident" serves to "rebut the mental element of the crime or crimes with which the defendant was charged," trial courts do not have a duty to instruct sua sponte on the defense provided the jury is properly instructed "on the requisite mental element of the offense." (*Id.* at p. 998.)

In *People v. Lawson* (2013) 215 Cal.App.4th 108 (*Lawson*), the appellate court extended *Anderson's* reasoning to the defense of mistake of fact, which, like the defense of accident, is codified in Penal Code section 26:  "All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Three – Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent."  The court explained that, under *Anderson*, "the trial court's sua sponte instructional duties do not apply to defenses that serve only to negate the mental state element of the charged offense when the jury is properly instructed on the mental state element." (*Lawson, supra* 215 Cal.App.4th at p. 119.) Accordingly, when the defense of mistake is asserted "only to negate the mental state element of the crime," the trial court has no duty to instruct on the defense sua sponte.[5] (*Id.* at p. 118.)

---

[5]    *Lawson* recognized that a prior appellate decision–*People v. Russell* (2006) 144 Cal.App.4th 1415–held a trial court does have a sua sponte duty to instruct on mistake of fact.  The court noted, however, that *Russell* was decided before *Anderson* and was

20

In this case, Dean contends that "the kidnapping charge . . . was a specific intent crime" because, under section 207 subdivision (e), the prosecution was required to prove she forcibly detained M.M. "for an illegal purpose or with an illegal intent." The "illegal purpose" alleged here was child abduction (§ 278.5), which, according to Dean, "requires a specific intent to deprive the custodial parent of the right to physical custody of the minor child." Dean asserts that her good faith "misconception about [Vanessa's] legal rights under the family law negates the intent to deprive another person of their right to physical custody of the child." She further asserts that, without such intent, she could not be found to have acted with an illegal purpose in detaining M.M. and therefore could not be convicted of kidnapping. Based on Dean's statements, it is apparent that, as in *Lawson*, her "mistake of fact" defense amounts to "no more than a claim that the defendant acted without forming mental state necessary to make his or action a crime." (*Lawson*, *supra*, 215 Cal.App.4th at pp. 117-118.) Thus, under the rationale of both *Anderson* and *Lawson*, the trial court had no duty to instructs on mistake of fact.

However, even if we were to assume *Anderson* and *Lawson* were inapplicable here, and that a trial court generally does have a sua sponte duty to instruct on mistake of fact, Dean's claim would still fail. A court's sua sponte duty to instruct on a defense arises only when the instruction is not inconsistent with the defendant's theory of the case and there is substantial evidence to support it. (*Breverman, supra,* 19 Cal.4th at p. 157.) During the trial court proceedings, the prosecution requested an instruction on mistake of law. Defense counsel objected, asserting that the instruction was unnecessary "because there isn't a contention by the defense that [Vanessa] made any mistake or the defendant made any mistake of law. We are not . . . claiming that." In response, the prosecution argued Dean had presented evidence suggesting she believed Vanessa was permitted to take M.M. from the home of Mark's parents. Defense counsel, however, clarified that Dean was "not contending . . . mistake of fact" and asserted there was "no evidence of mistake, no argument by the defense of mistake."

therefore "apparently no longer good law" on that issue. (*Lawson*, *supra*, 215 Cal.App.4th at p. 119.)

In light of defense counsel's repeated assertions that there was "no evidence" Dean or Vanessa made a mistake of fact, and counsel's express denial that Dean was proceeding under a theory of mistake of fact, we find no error in the trial court's failure to provide a sua sponte instruction on the defense.

### C. The Trial Court Did Not Commit Evidentiary Error

Dean next contends that the trial court erred by permitting the prosecution to admit two pieces of evidence at trial: (1) Terrell Hooper's testimony that, while visiting Vanessa at her apartment, he had seen Dean in possession of a firearm; and (2) song lyrics that Dean purportedly wrote after being arrested.

#### 1. Governing law

Evidence is admissible only if it is relevant. (Evid. Code, § 350.) All relevant evidence is admissible except as otherwise provided by a statutory or constitutional exclusionary rule. (See Cal. Const., art. I, § 28, subd. (f)(2); Evid.Code, § 351.) Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The general test of relevance "'is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.'" (*People v. Bivert* (2011) 52 Cal.4th 96, 116.) However, if evidence leads only to speculative inferences, it is irrelevant. (*People v. Morrison* (2004) 34 Cal.4th 698, 711.)

Even relevant evidence may be excluded in the trial court's discretion if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352; *People v. Lee* (2011) 51 Cal.4th 620, 643 (*Lee*).) A trial court has broad discretion in determining whether evidence is relevant and whether Evidence Code section 352 precludes its admission. (*People v. Mills* (2010) 48 Cal.4th 158, 195; *People v. Williams* (2008) 43 Cal.4th 584, 634.) We review for abuse of discretion a trial court's rulings on the admissibility of

evidence, including those turning on the relevance or probative value of the evidence in question. (*Lee, supra,* 51 Cal.4th at p. 643; *People v. Hamilton* (2009) 45 Cal.4th 863, 930.) Nevertheless, even if the trial court abused its discretion in admitting irrelevant evidence, reversal is not warranted unless the evidence was prejudicial. "[S]tate law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*).) Federal due process is offended only if admission of the irrelevant evidence renders the trial fundamentally unfair. (*Ibid.*)

### 2. *The trial court did not err in permitting the testimony of Terrell Hooper*
#### a. *Summary of trial court proceedings*

Prior to trial, the prosecution filed a motion to introduce evidence that Dean was in possession of a weapon prior to the date on which Monty was shot. At the hearing on the motion, the prosecutor represented that Terrell Hooper intended to testify he had previously seen Dean handling a small caliber firearm, which was consistent with the bullets recovered during Monty's autopsy. Defense counsel objected to the admission of Hooper's testimony, stating: "I'll just object under 352 and submit it. I really can't articulate any objection." The trial court overruled the objection, explaining "the fact that someone has an implement similar to the one used is obviously probative . . ."

At trial, the prosecutor reiterated that Hooper intended to testify he had seen the defendant with a "small gun." Although defense counsel renewed her objection to the testimony, she did not offer any basis for the objection. The trial court overruled the objection and permitted Hooper to testify. Hooper subsequently testified that he was a friend of Vanessa, had visited her apartment three to four times a week and had seen Dean cleaning and handling a small firearm during every visit. Defense counsel did not further object to Hooper's testimony.

23

*b. The court did not err in failing to exclude Hooper's testimony on relevancy grounds*

Dean argues the trial court should have excluded Hooper's testimony on relevancy grounds. Dean asserts that, in light of her admission she shot Monty, evidence demonstrating she possessed a firearm prior to the date of the shooting had no possible relevance to any disputed issue at trial. According to Dean, "the only possible inference the jury could draw [from the evidence] was that . . . Dean was a violent person who was so obsessed with guns she was constantly handling and cleaning one."

As a """general rule[,]"' . . . '"questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal."'" (*People v. Alvarez* (1996) 14 Cal.4th 155, 186; see also Evid. Code, § 353 [verdict shall not be set aside by reason of erroneous admission of evidence unless "[t]here appears of record an objection to . . . the evidence that was timely made and so stated as to make clear the specific ground of the objection"].) In the trial court, defense counsel never asserted that Dean's admission that she was the shooter necessarily rendered Hooper's testimony irrelevant as to any disputed issue at trial. Counsel asserted only that she was objecting under "section 352" and explained that she could not articulate a specific basis for the objection. Section 352 permits a trial court to exclude relevant evidence if its probative value is substantially outweighed by its prejudicial value. On appeal, however, Dean asserts for the first time that "[s]ince there was no dispute Dean shot [Monty], her prior possession of a gun similar to the one she used to shoot him was irrelevant." Because Dean never raised a relevancy objection at trial, that objection has been forfeited.

Even if Dean had properly raised such an objection at trial, however, we would find no error in the trial court's decision to admit Hooper's testimony. Contrary to Dean's assertion, evidence that Hooper regularly saw her in Vanessa's apartment handling and cleaning a weapon similar to the one she used to shoot Monty was not rendered "irrelevant" merely because she conceded she was the shooter. First, the evidence suggested Dean possessed the weapon when she left Nevada, raising the

24

inference that she understood from the outset that removing M.M. from father's custody might require the use of force. Such evidence tended to refute Dean's repeated assertions at trial that she and Vanessa intended to take M.M. peacefully and never meant to abduct or kidnap the child. Second, Hooper's testimony tended to show Vanessa had reason to know or suspect Dean had a firearm in the vehicle, which was relevant to proving Vanessa's status as a direct perpetrator of child endangerment. As explained above, Vanessa's status as a perpetrator was relevant to proving Dean liable for child endangerment under an aider and abettor theory.

Finally, even if Dean had not forfeited her relevancy objection, and the trial court had abused its discretion in admitting the evidence, it is not reasonably probable the verdict would have been more favorable to the defendant if Hooper's testimony had been excluded. (See *Partida*, *supra,* 37 Cal.4th at p. 439.) First, the prosecution introduced other pieces of evidence indicating Dean possessed and displayed a firearm prior to the day of the shooting. Mark testified he saw a firearm in Vanessa's residence shortly after Dean moved in with her. Evidence was also introduced showing that, during a post-arrest interview, Vanessa made statements indicating Dean had used the smaller of her two firearms when she committed the crime. Thus, even without Hooper's testimony, the jury would have been exposed to evidence showing that Dean possessed firearms prior to the date in question.

Second, as Dean concedes, the primary issue at trial was whether she shot Monty in self-defense. According to her theory of the case, Monty had attacked Vanessa outside the car, and then entered the car and began attacking Dean, at which point Dean shot him. The prosecution, however, contended that Dean had shot Monty while he was outside the car. The prosecution introduced evidence that cast significant doubt on Dean's theory of the case. Investigating officers reported that neither Dean nor Vanessa displayed any injuries that were consistent with an attack by Monty. A crime scene reconstruction expert testified that, based on Monty's entry wounds, it was inconceivable that Monty was shot inside the car. Moreover, although responding officers found Monty lying in

25

the street bleeding profusely from his injuries, not a single trace of blood was found in Dean and Vanessa's car.

In light of the issues and evidence presented at trial, there is no reasonable probability the outcome would have been different had the court excluded Hooper's testimony regarding Dean's prior possession of a firearm.

### 3. *The trial court did not err in permitting the prosecution to introduce handwritten song lyrics recovered from Dean's property*

#### a. *Summary of trial court proceedings*

Prior to trial, the prosecution informed the court it intended to call a witness to authenticate a handwritten note that was found among Dean's property at a Nevada detention facility. The note appeared to include song lyrics stating, in part: "I'm sending niggers to school and giving classes in fashion, and seeing a man die is one of my favorite lessons . . ." The note also included a reference to "Medeon," which was Dean's "rap" moniker.

The defense objected to the admission of the lyrics, asserting that they should be excluded pursuant to section 352 unless the prosecution could show Dean had written them in close temporal proximity to the crime. In response, the prosecution argued that the lyrics had been recovered from Dean at the time of her detention, suggesting that they had been written after she had been arrested and placed in custody. The court announced it was inclined to permit the evidence, but would revisit the issue before the witness testified.

At trial, Deputy Dina Black testified that, on April 17, 2007, she traveled to a Nevada detention facility to assist in extraditing Dean back to California. She further testified that an employee at the detention facility provided her a locker containing Dean's property, which included the handwritten song lyrics. The lyrics were then read to the jury.

26

### b. The court did not err in failing to exclude the rap lyrics pursuant to section 352

On appeal, Dean contends the court should have excluded the rap lyrics pursuant to section 352 because "there was no evidence [the lyrics were] written during the . . . period between the time Dean shot and killed Monroe and the day she was arrested." She asserts that, "absent evidence[she] wrote the lyrics after she shot [Monty]," the jury could only "speculat[e] [as to whether] she was referring to [Monty's] shooting in the song."

Dean does not dispute that rap lyrics may generally be admitted as "probative of defendant's state of mind and criminal intent . . ." (*People v. Zepeda* (2008) 167 Cal.App.4th 25, 35; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1372-1373.) She contends only that such evidence was inadmissible here because there was no proof as to whether she wrote the lyrics before or after the crime was committed. Officer Black, however, testified that the handwritten lyrics were found among property that was recovered from Dean during her incarceration at the Nevada detention facility. While that evidence does not prove when the lyrics were written, we cannot say the trial court abused its discretion in concluding that a jury might reasonably infer from that evidence that Dean wrote the lyrics after committing the crime. Dean was free to argue to the jury that the lyrics were of limited probative value in light of the prosecution's failure to prove when she wrote them. Such arguments, however, go to the weight of the evidence, not its admissibility.

### D. The Trial Court Did Not Violate Section 654 by Imposing Separate Punishments for Murder and Felony Child Endangerment

Dean contends the trial court violated Penal Code section 654 by imposing a 16-month prison term on her child endangerment count (§ 273a, sub. (a)), which was to be served consecutively to her sentence of 40 years to life for second degree murder. According to Dean, her "convictions [for child endangerment and murder] were based on the identical act: Dean firing her gun at [Monty] and killing him. [The] sole objective was to shoot [Monty]. Since the child [endangerment] conviction had no separate intent

27

and objective from the murder and was based on the same act, it was impermissible to impose separate punishment for that offense." The People, however, assert the trial court properly concluded Dean's acts fell within the "multiple-victim" exception to section 654, thereby precluding application of the statute.

Penal Code section 654 generally "prohibits punishment for two crimes arising from a single, indivisible course of conduct. [Citation.] Thus, if all of the crimes were merely incidental to or were the means of accomplishing or facilitating a single objective, the defendant may receive only one punishment. [Citation.]"[6] (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) It is well-established, however, that the statute "do[es] not apply to crimes of violence against multiple victims.'" (*People v. Oates* (2004) 32 Cal.4th 1048, 1063.) Under this "multiple-victim" exception, "'even though a defendant entertains but a single principal objective during an indivisible course of conduct, he may be convicted and punished for each crime of violence committed against a different victim.' [Citations.]" (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781.) "As the purpose of section 654 'is to insure that a defendant's punishment will be commensurate with his criminal liability,' when he 'commits an act of violence with the intent to harm more than one person or by means likely to cause harm to several persons,' his greater culpability precludes application of section 654. [Citation.]" (*People v. Miller* (1977) 18 Cal.3d 873, 885.)

"[W]hether a crime constitutes an act of violence that qualifies for the multiple-victim exception to section 654 depends upon whether the crime . . . is defined to proscribe an act of violence against the person." (*People v. Hall* (2000) 83 Cal.App.4th 1084, 1092 [disapproved on other grounds, *People v. Correa* (2012) 54 Cal App.4th 331, 345-344].) The crime of felony child endangerment is """"intended to protect a child from an abusive situation in which the probability of serious injury is great." [Citation.]'"

---

6       Section 654, subdivision (a) states in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

(*Valdez, supra,* 27 Cal.4th at p. 784.) The statute prohibits any person from willfully injuring or endangering a child under circumstances that are likely to result in great bodily harm or death. (See *People v. Smith* (1984) 35 Cal.3d 798, 806.) Because felony child endangerment by definition entails the likelihood of great bodily injury or death, it qualifies as a violent crime for purposes of the multiple victim exception. (See *People v. Pantoja* (2004) 122 Cal.App.4th 1, 14 (*Pantoja*).)

Dean, however, contends that M.M. was not a "victim" within the meaning of the "multiple-victim" exception because there is no evidence he sustained physical injury or that Dean intended to harm him. This same argument was considered and rejected in *Pantoja, supra,* 122 Cal.App.4th 1. The defendant in *Pantoja* was alleged to have stabbed his girlfriend repeatedly in the presence of their daughter. The jury convicted the defendant of murder and child endangerment, and the trial court imposed consecutive prison terms on each count. On appeal, defendant argued the trial court should have stayed his sentence for child endangerment under section 654 "because 'both convictions . . . [had] result[ed] from [defendant's] single act of causing the death of [the victim]." (*Id.* at p. 15.) Defendant contended that, for the purposes of the multiple-victim exception, his child endangerment conviction did not qualify as a "crime of violence" because the "defendant did not direct his acts at [the child]." (*Ibid.*) The court rejected the argument, explaining that the exception may be properly applied where the evidence shows the defendant "commit[ted] an act of violence . . . by a means likely to cause harm to several persons . . . . There is no requirement that the prosecution show that the defendant intended harm to each victim by his wrongdoing." (*Ibid.*)

As in *Pantoja*, Dean was convicted of murder and child endangerment after killing the victim in close proximity to a child. The evidence at trial showed Dean fired her weapon toward the passenger side of the vehicle. Vanessa, who was holding M.M in the passenger seat at the time of the shooting, testified she could feel Monty directly to her left when she heard the two gunshots. Dean later informed a third party that she was not "aiming" when she pulled the trigger; she just "pointed" the weapon in the general direction of Monty and "shot." Based on this evidence, the trial court could reasonably

29

conclude Dean's committed an act of violence by means likely to cause harm to multiple persons. Accordingly, the multiple-victim exception applies. (*Pantoja, supra,* 122 Cal.App.4th at p. 16 [exception applies where defendant "commits an act of violence . . . *by a means likely to cause harm to several persons*"] [emphasis in original].)

## DISPOSITION

The judgment is affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.