Filed 8/20/14  P. v. Flenory-Davis CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAIVONNE FLENORY-DAVIS,<br><br>Defendant and Appellant. | C072000<br><br>(Super. Ct. No. 10F04481) |

A jury found defendant Jaivonne Flenory-Davis guilty of first-degree murder, with the personal and intentional discharge of a firearm, and for the benefit of a street gang (Guttah Boys/Stick-Up Starz/G-Mobb), and attempted murder with the personal and intentional use of a firearm, causing great bodily injury, and for the benefit of a street gang.  (Pen. Code, §§ 186.22, subd. (b)(1), 187, subd. (a), 664/187, 12022.53, subds. (b)-

1

(d).)[1]  A strike allegation (first degree burglary) had been bifurcated but was never adjudicated, therefore we deem it to have been dismissed.  The trial court sentenced defendant to prison; the details of the sentence are discussed in part IV, *post*.  Defendant timely appealed.

On appeal, defendant contends:  (1) no substantial evidence corroborated the testimony of an accomplice; (2) the trial court misinstructed on the "kill zone" theory in two respects; (3) the prosecutor committed misconduct in argument; (4) the trial court made two sentencing errors; and (5) the trial court erred in not awarding actual custody credits.  The People concede the sentencing claims and, after reviewing the record, defendant now agrees the custody credits were properly calculated.  Because we agree that the trial court erred in sentencing defendant to the agreed-upon sentence, we accept the concessions.  We disagree with defendant's other contentions of error.  We shall modify the judgment and remand for resentencing on one count.

## FACTS

On July 11, 2010, a gang fight broke out at a party for teenagers at a rented venue on Auburn Boulevard, and two wholly innocent bystanders were shot, 14-year-old Lanajah Dupree, who died at the scene, and C.M., an older teenage girl who survived.

The defense theory was to concede the shootings were heinous and unjustified, but contend that defendant was innocent, and Nikko Alexander, the alleged accomplice, blamed defendant to avoid Alexander's own liability for shooting the girls.

A number of teenagers went to a club party advertised online.  There were security guards present.  At some point, people started running and yelling "fight" and "gun" and then pepper-spray was deployed; when everyone rushed outside, gunshots were fired.  A friend saw Dupree die on the ground near the doorway.

---

[1]  Further undesignated statutory references are to the Penal Code.

Alexander testified his girlfriend told him she was at the party, and he called defendant ("Jay") and they went together to the party, with Alexander driving. Alexander's car was white with a black fender and gray bumper. Alexander did not have a gun in the car and did not know defendant had one. He parked at the far end of the nearby Tradewinds Motel, and they walked to the club. Defendant was wearing a long black T-shirt, extending below his pants pockets. After paying a fee, Alexander was "patted down" by security before he could enter. At some point, Alexander saw some men from Gunz-Up, a rival gang, in the club. Alexander was affiliated with the Guttah Boyz gang in Sacramento. He disclaimed knowledge of any "beef" with the Gunz-Up gang. The Gunz-Up members asked defendant where he was from, to which he responded "G-Mobb." This led to a fight, in which Alexander and defendant were overmatched by 10 to 15 Gunz-Up members, and there were no "south area" affiliates (from Guttah-Boyz, Stick-Up Starz, or G-Mobb gangs) to assist the duo. Eventually they were pepper-sprayed, Alexander's girlfriend pushed him through and out of the club, and as he ran up the driveway of the hotel toward his car, he saw defendant coming back from the same direction. Alexander followed defendant toward the club, thinking they were going to fight, and then defendant started shooting. Defendant fired about six times, but Alexander did not see where he was shooting. Alexander ran to the car and drove off with defendant. He testified that he asked defendant no questions, was afraid, and just wanted to get away. When Alexander learned two girls had been shot--one fatally--he felt responsible, though he had been "surprised and shocked" defendant had a gun and could not have stopped him.

The jury was shown a video recording from the motel and Alexander testified the car seen therein was his car. He identified himself and defendant as the two people seen leaving the car and walking toward the club; he was wearing a white shirt and defendant had on a black shirt. The recording later shows Alexander returning to the car; he testified that he returned to leave his jacket in the car.

3

The video, which we have reviewed, is not of good quality. It shows a white car with a dark fender and bumper park (backing in) on the side of the motel farthest from the club. Two men, in white (Alexander) and black (defendant) T-shirts, respectively, walk toward the club. Alexander returns to the car and runs back to the club, again returns to the car, then again runs back toward the club. Several minutes after that, defendant runs to the car, followed by Alexander, but before Alexander even reaches the car, defendant runs back past him towards the club and Alexander turns and follows. Soon after, both run back to the car and quickly leave the parking lot.

Alexander admitted that when he first spoke to the police, he lied and said he left the party before the shooting began, and he may have said he was by himself. The second time he spoke to the police, with the assistance of counsel, he told the truth, because he did not want to "do life" for something defendant did, and his parents had urged him to be honest. He testified that the third time he spoke with the police, an investigator, the prosecutor, and his father were present, and he told the truth that time, too. He agreed to testify truthfully in exchange for an eight-year prison sentence, based on his plea to being an accessory to murder, with a gang enhancement.

The jury watched a DVD recording of the third interview between Alexander and the police. In it, Alexander said defendant shot toward the club, where the people from the club were standing, shooting into the crowd, but Alexander could not see any of the people they had fought with. He heard "probably" eight shots. After the shooting made the news, defendant told Alexander not to say anything.

Bianca B. testified she heard Alexander being confronted by another person at the party, which made Alexander look scared. After the shooting, she saw Alexander running and jumping over a gate between the motel and a car dealership. M.M. testified she felt tension when some men in the club pointed to another man and used profanity, so she and her friends went to tell a guard, but then people started to run out of the club. Later, while outside the club, she heard seven or eight gunshots, and one of her friends

4

yelled "gun." A Black man wearing a black shirt, bandana, and "dreads" ran past her. She told the police the man had a black semi-automatic, but explained that is what she learned from her friend Skye.

Skye B. saw several males confront Alexander in the club, and they "swarmed" him, so she and her friends got scared and went to tell a guard. They ran out towards a car dealership and saw two "boys" running toward the motel. Then one ran back, carrying a gun, then Skye B. heard multiple gunshots fired soon after. The man with the gun was wearing a dark shirt, a bandana, and had short dreadlocks, and she described him to an officer as Black, with a "big black shirt" and "blonde tips" on his dreadlocks. The gun was a black handgun. She was not "a hundred percent sure," but defendant had a "familiar face" to that of the man with the gun. She had picked him out as the shooter in a live line-up before trial, but she had not been positive then, either, writing that "I'm not sure but I think No. 2 [defendant] was the person" with the gun. A detective testified that defendant had the same general appearance as the description of the shooter that emerged from Skye B. and the other witnesses--a Black male, about 5'10" and 150 pounds, with dreadlocks that had colored tips.

J.G. was Alexander's girlfriend. She was at the club that night and saw him "in the middle of a lot of boys," grabbed him, and then the guards "pepper sprayed." She saw defendant, but could not remember whether he, too, was fighting in the club. Alexander did not discuss the shooting with her.

One of the guards testified that about eight to 10 guards were working that night. He and another guard broke up the indoor fight, and after the other guard used pepper spray, "everybody began to run outside." While he was standing behind his patrol car, he heard gunshots coming from the front of the car, and when he lay on the ground, he could see the shooter's legs, and then saw the shooter--a Black man with braided hair--run towards an alleyway, with another Black male. Another guard testified he saw "about five young men beating and kicking two other men"--all Black-- and tried to stop the

5

fight, and eventually used his pepper spray. Outside, he saw muzzle flashes, about two or three into the air, and four of five directed lower, where the bullets ricocheted off the ground toward the building. He saw three to four Black males running from where he had seen the flashes. The one he thought was the shooter had a black T-shirt and "dreadlocks about shoulder length."

Dupree was shot through her heart. A criminalist examined six cartridge casings and a bullet. The casings were all fired from the same gun, a nine-millimeter gun, consistent with the bullet. That bullet was found just inside the front door of the building, and the six casings had been grouped together on the ground, showing the shooter was stationary.

Detectives were told by several witnesses that they had heard the name "Nikko Alexander" spoken at the party, and they learned of a white car with black front fender involved with the shooting. Alexander's photograph was used to confirm his presence at the club. They interviewed him and seized his car. During the first interview, Alexander identified "Jay" as the shooter, and the description the detectives developed was that of a Black male, about 5'10", with dreadlocked hair, wearing a black T-shirt. Alexander's relatives identified a photograph of defendant as Alexander's friend "Jay." The detectives arranged a live line-up which they showed to nine witnesses, but only one, Skye B., picked defendant as the shooter. Alexander's and defendant's fingerprints were found in Alexander's car.

A gang expert testified defendant was a member of the G-Mobb street gang, which is affiliated with the Starz or Stick-Up Starz and Guttah or Guttah Boys subsets. In 2007 to 2008, some members of the Guttah Boys broke away and called themselves Gunz or Gunz-Up and allied with the local Bloods, who dominate Sacramento gangs, and are G-Mobb enemies. Defendant was a member of the Starz-Up subset of G-Mobb, but lived in Blood territory, his house was shot up once, and he also had been shot in the leg while in his neighborhood. Alexander is also a member of Starz-Up. The shooting at the club

6

was gang-related. The failure to respond to a challenge or disrespect by a rival gang member would cause a loss of face, hence, a challenged gang member "must retaliate" to maintain his status.

## DISCUSSION

### I

*Accomplice Corroboration*

Defendant contends insufficient corroborating evidence supports Alexander's testimony, as an accomplice to the crimes. We do not agree.

The testimony of an accomplice must be corroborated "by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.) Testimony of an accomplice adverse to the defendant must be viewed with caution. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.) The jury was instructed to apply these rules to Alexander's testimony.

"Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.'" (*People v. Valdez* (2012) 55 Cal.4th 82, 147-148; see CALCRIM No. 335.)

The gist of defendant's contention is that Alexander was the only witness who identified defendant as the shooter. This is not fully accurate.

Although Alexander may have been the only witness who testified directly and positively that defendant was the shooter, other evidence corroborated that testimony. Skye B. saw defendant with a gun before the shooting, and she thought he was the shooter. An identification need not be certain to be of probative value. (See *People v. Gonzales* (1968) 68 Cal.2d 467, 472 ["Lack of positiveness as to the man's identity went

7

to the weight and not to the competency of the evidence"]; *People v. Young* (1894) 102 Cal. 411, 413.)  The motel video recording shows a Black man running in a black T-shirt after the shooting, and one guard testified the shooter was Black, wearing a black T-shirt and had dreadlocks, which matches defendant's description, and that the shooter ran off with another Black man, presumably Alexander.  Another guard also testified he thought the shooter was a Black man wearing a black T-shirt and long dreadlocks.  Defendant's fingerprints were found in Alexander's car, corroborating Alexander's testimony that defendant went to the club with Alexander.  Several witnesses testified about the gang challenge and fight that provided defendant a motive, in that both he and Alexander are in the same gang, and had been attacked by rival gang members, calling for retaliation, in the culture of criminal street gangs as described by the gang expert.

In short, there is sufficient evidence in the record to corroborate Alexander's testimony identifying defendant as the shooter.[2]

II

*Kill Zone Instruction*

Defendant raises two challenges to the "kill zone" instruction; first that the term is inflammatory, and second that the term was not adequately defined.  We reject both contentions.

A.  *Use of Term "Kill Zone"*

Defendant first contends the very term "kill zone" as used in the pattern instruction (CALCRIM No. 600) is so inflammatory that its use was prejudicial.  He

_____

[2]  To the extent defendant recasts his claim as a denial of federal due process, "the corroboration requirement itself is a matter of state law, not due process." (*People v. Felton* (2004) 122 Cal.App.4th 260, 273.)  In any event, we find adequate corroborating evidence, described above.  Therefore we reject defendant's alternative federal claim.

acknowledges precedent to the contrary, but contends it is not binding on this court and in any event he wishes to preserve the issue for federal review.

The modified pattern instruction as given in this case was as follows:

> "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of [C.M.], the People must prove that the defendant not only intended to kill a specific victim or victims, but also either intended to kill [C.M.], or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill [C.M.] or intended to kill [C.M.] by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [C.M.]."

Defendant acknowledges his claim is contrary to the holding in *People v. Campos* (2007) 156 Cal.App.4th 1228. *Campos* held: "CALCRIM No. 600 merely employs a term, 'kill zone,' which was coined by our Supreme Court . . . and referred to in later California Supreme Court cases. [Citation.] It does not invite inferences favorable to either party and does not integrate facts of this case as an argument to the jury." (*Id.* at p. 1244.)

We agree with *Campos*. The pattern instruction would not tend to inflame the jury, invite it to draw inferences favorable to either party, characterize the evidence adversely to defendant, or tell the jury that a kill zone had been created. Indeed, our Supreme Court has approved the trial court's discretion to use the term "kill zone" where factually appropriate. (See *People v. Stone* (2009) 46 Cal.4th 131, 137-138 (*Stone*).) Therefore, we reject defendant's contention that "kill zone" was improperly used at his trial.

B. *Definition of "Kill Zone"*

Defendant next contends that the term "kill zone" was not adequately defined by the instructions given to the jury. We disagree.

First, our Supreme Court in *Stone*, *supra*, 46 Cal.4th at pages 137-138 and *People v. Smith* (2005) 37 Cal.4th 733 at page 746, has held "kill zone" liability reflects a

9

reasonable factual inference, not a technical legal doctrine, and does not require any special jury instruction. (See also *People v. Bland* (2002) 28 Cal.4th 313, 331, fn. 6.)

Second, the pattern instruction (CALCRIM No. 600) told the jury the kill zone is the area in which defendant intended to kill everyone: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' " This defined "kill zone" as the "zone of harm" in which everyone is targeted. No further definition was necessary.

### III

### *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct during argument, by (1) vouching for a witness, (2) misstating a material fact, and (3) appealing to the jury's sympathy; he further contends the lack of trial objection should not result in forfeiture because there was no rational tactical reason for trial counsel not to object, and for other jurisprudential reasons we need not detail.

We conclude each of these claims is forfeited for lack of objection. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 841; *People v. Kipp* (2001) 26 Cal.4th 1100, 1130.) We discuss the claims nonetheless, as defendant argues ineffective assistance of trial counsel.

A. *Vouching*

In closing argument, defense counsel referred to a Sherlock Holmes story about a dog that did *not* bark in the night, pointing out Alexander did *not* tell his girlfriend that defendant was the shooter.[3] In rebuttal, the prosecutor replied as follows:

---

[3] Defense counsel referred to this passage of "Silver Blaze": "[Inspector Gregory]: 'Is there any other point to which would you would wish to draw my attention?' [¶] "[Holmes]: 'To the curious incident of the dog in the night-time.' [¶] 'The dog did nothing in the night-time.' [¶] " 'That was the curious incident,' remarked Sherlock Holmes." (2 Baring-Gould (2d ed. 1976) *The Annotated Sherlock Holmes*, p. 277.)

"Also, the idea that Nikko Alexander would tell his girlfriend that he saw [defendant] do that shooting. *It's my opinion* that that's not particularly something that you would expect to see these guys do, that these gang members would get to the point there they come home and say, Oh, I just saw Jay and he shot somebody up at the club. You are not going to just come right out and tell on your buddy like that." (Emphasis added.)

Defendant claims the phrase "It's my opinion," emphasized in the above quote, was impermissible vouching. Vouching occurs when a prosecutor expresses personal belief about evidence, such as whether or not a witness is telling the truth, because that suggests the prosecutor is basing the opinion on facts outside the record. (See, e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 206-207; *United States v. Kerr* (9th Cir. 1992) 981 F.2d 1050, 1053.) In the above passage, the prosecutor made an argument based on the trial evidence; the argument was that Alexander would not be inclined to tell his girlfriend that defendant was the shooter, given his and defendant's gang affiliations and the circumstances surrounding the shooting. Although the prosecutor's *opinion* of the inference to be drawn from the evidence was not relevant, and the prosecutor should not have expressed his personal opinion in the manner that he did, he did not suggest any evidence outside the record and he did not vouch. Counsel was not ineffective for failing to object.

B. *Misstating Facts*

The prosecutor argued Skye B. identified defendant as the shooter and picked him out of the lineup. The defense argued Skye B. was mistaken, and wrongly identified others in the lineup as being present at the club. In rebuttal, the prosecutor conceded Skye B. was not sure, but thought defendant was the shooter, "And that ID comes from someone who has got nothing to gain, and she is right on point. She is right on point. That's somebody, not Nikko Alexander, that IDs him."

On appeal, defendant contends the prosecutor misstated the facts, because of Skye B.'s uncertainty about her identification.

11

The jury was instructed that the arguments of counsel were not evidence, and to consider various factors in evaluating identification testimony, including the degree of certainty of the identification. We presume the jury followed these instructions. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Further, it was within the jury's bailiwick to determine whether Skye B.'s identification of defendant was sufficiently certain to be probative. (See *People v. Gonzales*, *supra*, 68 Cal.2d at p. 472.) The prosecutor merely presented one plausible interpretation of Skye B.'s testimony.

C. *Appeal to Sympathy*

On appeal, defendant faults the prosecutor for appealing to the sympathy of the jury, by referring to the tragic death of Dupree.

Assuming for the sake of argument any improper appeal to sympathy was made, the defense tactic, expressed both in opening statement and in closing argument, was to *concede* that the crimes were heinous and unjustified, but to argue that Alexander, not defendant, committed them.

Therefore, it was rational for the defense to refrain from objecting to argument emphasizing the nature of the crimes. In fact, it may have *bolstered* the defense, by strengthening Alexander's motive to lie to and blame defendant. Because the record shows a rational tactical reason for not objecting, the claim of misconduct must be rejected on this record. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

IV

*Sentencing Claims*

Defendant raises two sentencing claims, which the People concede. We agree with the parties.

The trial court sentenced defendant as follows: count one, murder of Dupree, 25 years to life, plus 25 years to life for the firearm enhancement, plus 10 years for the gang enhancement; count two, attempted murder of C.M., life--with a minimum parole period of seven years--plus 25 years to life for the firearm enhancement, plus 10 years for the

12

gang enhancement. The trial court then characterized the total as a 20-year determinate term, "plus a consecutive indeterminate term of 82 years to life."

Defendant first contends the life sentence, with a seven-year minimum parole eligibility date, is unauthorized for count two, because the information did not charge, and the jury did not find, that the attempted murder was willful, premeditated and deliberate, therefore the only lawful sentence would be to select from the triad of five, seven, or nine years, as provided by section 664, subdivision (a). The People agree, implicitly ascribing the problem to an apparent pleading oversight by the prosecutor. We accept the concession of error. (See *People v. Lee* (2003) 31 Cal.4th 613, 616 [pleading and proof required in order to impose life term for attempted murder].)

The People contend the matter must be remanded for the trial court to exercise its discretion to choose a lawful sentence on count two, but in his briefs, defendant asks this court to "correct" the unauthorized sentence.

While we have the authority to modify a sentence under appropriate circumstances (§ 1260), we agree that in this case remand is necessary because we cannot simply "correct" this particular sentence as suggested by the Attorney General. Here, the trial court did not exercise its discretion to select from among the available lawful sentences, and the failure to exercise sentencing discretion necessarily is an abuse of such discretion. (See *People v. Carmony* (2004) 33 Cal.4th 367, 374.)

Defendant also contends it was improper to impose the 10-year gang enhancements, instead of 15-year minimum parole eligibility terms, based on the imposition of life sentences. The People agree as to count one, but point out that because of the concession that no indeterminate term is authorized for count two, the 10-year enhancement need be stricken only as to count one, in lieu of which a 15-year minimum parole eligibility date should be imposed (see § 186.22, subd. (b)(5)). We agree. (See *People v. Lopez* (2005) 34 Cal.4th 1002, 1004; *People v. Louie* (2012) 203 Cal.App.4th 388, 396.)

We modify the sentence to strike the 10-year gang enhancement on Count 1, and impose a 15-year minimum parole eligibility period for count one. The 10-year gang enhancement remains intact as to count two, to be appended to the determinate term later selected by the trial court after resentencing on that count.

V

*Custody Credits*

Defendant contends the trial court improperly denied him actual custody credits towards his sentence, and variously asserts those credits amount to either 544 or 546 days. The People agree with the lower figure. On further review of the record, defendant also agrees with the lower figure.

The parties agree, consistent with the calculations in the probation report, that defendant was entitled to 544 days of actual credit, but no conduct credit because defendant was convicted of murder (see § 2933.2), and because that is the figure that appears on the determinate sentencing abstract, it appears the trial court made the correct credit award, albeit not on the record at sentencing as required. At the resentencing hearing, the trial court should state the credit award on the record.

## DISPOSITION

The judgment as modified as described in this opinion and the cause is remanded to the trial court for resentencing on count two consistent with this opinion.  Following resentencing, the trial court shall prepare and forward to the Department of Corrections and Rehabilitation certified copies of amended determinate and indeterminate abstracts of judgment reflecting our modifications and the new sentence on count two.


                                    DUARTE                , J.



We concur:



        BLEASE          , Acting P. J.



        MURRAY        , J.


15