[No. E033333. Fourth Dist., Div. Two. Sept. 13, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDRA FELTON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III, IV, and V.

COUNSEL

Paul R. Ward, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon, Jr., and Karl T. Terp, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**RICHLI, J.**—Defendant struck his girlfriend's baby daughter—then less than a month old—so hard that he broke three of her ribs. In case No. FSB026722, he pleaded guilty to felony child endangerment (Pen. Code, § 273a, subd. (a)), and he admitted a personal infliction of great bodily injury enhancement (Pen. Code, § 12022.7, subd. (a)). He was placed on probation, with jail time to be served on weekends.

When the baby was five months old, her mother left her with defendant one night so she could go to work. By the time she got back, the baby had two skull fractures, severe brain damage, and numerous other injuries. Defendant threatened to kill the mother if she took the baby to the hospital.

As a result, in case No. FSB028320, a jury found defendant guilty on one count of felony child endangerment (Pen. Code, § 273a, subd. (a)), with an enhancement for personal infliction of great bodily injury on a child under five (Pen. Code, § 12022.7, subd. (d)), and on one count of attempting to make a criminal threat (Pen. Code, §§ 422, 664). Two "strike" prior conviction allegations (including the conviction in case No. FSB026722) were found true. Defendant was sentenced to 55 years to life in prison.

In case No. FSB026722, defendant's probation was revoked, and he was sentenced to an additional six years in prison.

In the published portion of this opinion, we will hold that the trial court erred by ruling that the mother was not an accomplice because she did not have the specific intent necessary to be an aider and abettor. For instructional purposes, an "accomplice" includes a coperpetrator as well as an aider and abettor. There was substantial evidence that the mother, through her criminal negligence in leaving the baby with defendant, was a coperpetrator of defendant's crime of felony child endangerment (in fact, she had already pleaded guilty to felony child endangerment). Thus, the trial court should have given accomplice instructions. We will also hold, however, that the error was harmless because the mother's testimony was adequately corroborated.

In the nonpublished portion of this opinion, we find no other error. Hence, we will affirm.

## I

## FACTUAL BACKGROUND

Melanie Littlefield met defendant in September 1999. She was pregnant at the time. In January 2000, their relationship became first romantic, then sexual.

On May 4, 2000, Littlefield gave birth to a daughter, named Cree. She already had a three-year-old son, named Trevaughn. Defendant was very attentive to the baby, as if she were his own.

A. *The Prior Offense.*

On May 31, 2000, Littlefield told defendant "he had to leave because the baby was there now and financially we weren't making it." Defendant called his sister and asked her to come and pick him up. Meanwhile, Littlefield took a shower. She left the baby lying on the couch. While in the shower, she heard the baby crying "like she was hurt." She ran into the living room. Defendant was holding the baby. The "onesie" the baby had been wearing was on the floor. Defendant said the baby had rolled off the couch.

Littlefield took the baby to the hospital. She asked the doctors to take X-rays. The baby's only apparent symptoms, however, were vomiting (which the doctors attributed to a previous bout of meningitis) and resulting dehydration. After an external examination, they told Littlefield to take the baby home.

The next morning, the baby was still vomiting, so Littlefield took her back to the hospital. There, the baby was seen by Dr. David Tito. He ordered X-rays, which revealed that the baby had three broken ribs, on the left side. There was a fluid-filled space around her brain that was "potentially consistent" with the healing stage of "shaken baby syndrome."

According to Dr. Tito, "It's physically impossible for a 28-day-old baby to roll or roll off the couch [under] their own power." Moreover, the baby's broken ribs could not have been caused by falling off a couch; they would have required a fall of at least five or six feet.

Both children were immediately removed from Littlefield's custody. Defendant and Littlefield were arrested. Littlefield was charged with child

abuse, but the charges were dropped almost immediately. Defendant pleaded guilty to child abuse and admitted personally inflicting great bodily injury.

B. *The Current Offense.*

In July 2000, defendant was released from jail. He began visiting Littlefield again. Littlefield kept asking him if he had hurt the baby, but he insisted that the baby had fallen off the couch. At her request, he swore on a Bible. After that, she believed him.

In September 2000, Littlefield regained custody of her children. She had to agree "[n]ever to allow [defendant] around my kids." Nevertheless, in late September or early October, he started visiting her apartment. On the first visit, he wanted to see Trevaughn, and she let him. The next time, she let him watch the baby for 15 to 20 minutes while she took Trevaughn to school. On his third visit, he looked after both children for about an hour while she went to the Department of Social Services.

On October 25, 2000, defendant watched both children while Littlefield went to work. The baby had been diagnosed with gastroesophageal reflux disorder, which was causing her to vomit "a little," and she had a cold. When Littlefield left, however, at 6:00 or 6:30 p.m., the baby was alert and responsive.

While Littlefield was on a break, sometime before 9:00 p.m., she phoned home. Defendant told her the children were okay. When she persisted in questioning him, he told her to shut up and get off the phone so he could play a video game.

Littlefield got home sometime after 11:00 p.m. She found the baby asleep on the couch. When Littlefield tried to pick her up, defendant told her to leave the baby alone and go to bed. About five minutes later, when he came to bed, he brought the baby with him. Littlefield tried to wake her, but "she wasn't responding. She wouldn't stay awake."

Littlefield said, "I have to take my baby to the hospital." Defendant responded, "You aren't going no where [*sic*], man. I am not being responsible. I ain't even supposed to be here. If I go to jail, I will kill you all."

Littlefield tried to call Cynthia Wallace, who was her friend and neighbor as well as defendant's sister-in-law. Defendant grabbed the phone and yanked out the cord. Littlefield then tried to call Wallace on a cordless phone; it rang once before defendant grabbed that phone, too. Wallace, however, had caller ID and returned the call.

Wallace testified that she got Littlefield's call after 11:00 p.m. She arrived at the apartment minutes later. At that point, Littlefield testified, defendant "completely changed," suddenly urging her to take the baby to the hospital. Wallace—who was a nurse's aide—examined the baby. The baby's reflexes were not functioning. Her pupils were fixed. There were two knots on her head. Wallace asked, "Did the baby fall?" Littlefield turned and looked at defendant; he said no.

Defendant left before the paramedics arrived, saying again that he was not supposed to be there and adding that "he didn't want . . . no one to think that he did anything." He went to a friend's apartment. He said he had had an argument with his girlfriend, so his friend let him spend the night.

After the baby was admitted to the hospital, she was treated by Dr. Rebecca Piantini, a specialist in child abuse cases. The baby was unconscious and unable to breathe on her own. She had two skull fractures. Blood vessels surrounding her brain were torn and bleeding. Nerve cells throughout her brain had been ripped apart. The retinas of both eyes were bleeding. She had a punctured lung, two broken legs, and possibly a fractured left wrist. There were bruises on her forehead and abdomen.

There were signs of previous bleeding around the brain that was in the process of healing. Also, in addition to the left-side ribs that had been broken in the earlier incident, there were "areas that were suspicious for healing fractures on the right side as well."

In Dr. Piantini's opinion, the baby's injuries could only be the result of child abuse. One of the skull fractures, in particular, would have required as much force as a car accident or a fall from a two-story building headfirst onto cement. The fact that both broken leg bones were sheared off at the tip was "highly specific for child abuse." The bleeding in the back of the eye indicated shaken baby syndrome. The abdominal bruises were in areas where bruises "don't just happen accidentally."

After "a beating like th[is]," symptoms would have shown up "right away"—in less than an hour.

The next morning, the police went to defendant's friend's apartment. They caught defendant trying to escape out a rear window.

When the police interviewed defendant, he told them Littlefield left for work at 6:30 p.m. While she was out, the baby was "okay." There was no one there besides defendant, the baby, and Trevaughn. Littlefield got back at

11:30 p.m. or midnight. Defendant was certain Littlefield would not have hurt the baby. When asked who could have done it, he said, "I don't know."

Littlefield pleaded guilty to child endangerment. Her plea was based on letting defendant be around the baby, not on her personally abusing the baby. She was sentenced to one year in jail.

## II

## FAILURE TO INSTRUCT REGARDING ACCOMPLICE TESTIMONY

Defendant contends the trial court erred by ruling, as a matter of law, that Littlefield was not an accomplice, and hence by refusing to give accomplice instructions.

### A. *Additional Factual and Procedural Background.*

Defense counsel requested accomplice instructions, arguing that Littlefield was an accomplice as a matter of law. The prosecutor disagreed, arguing: "[A]n accomplice has to share the criminal purpose of the . . . coparticipant. . . . She can be criminally negligent without any intention that the crime that [defendant] committed be committed."

The trial court responded: "In looking at the CALJICs for guidance, CALJIC 3.14, which is criminal intent, it is necessary to make one an accomplice. Merely attempting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator and without the intent or purpose of committing, encouraging, or facilitating the commission of the crime is not criminal. . . . [¶] And I think that's exactly what we have here. For her to be an accomplice, she would have to intend that she gave control of the baby or left the baby in defendant's possession so he could abuse the baby."

The trial court then ruled: "[T]he facts are clear and undisputed that she was not a[n] accomplice as a matter of law. So I don't think the accomplice instructions are appropriate and not warranted by the evidence, so they won't come in."

### B. *Analysis.*

■ If there is evidence that a witness against the defendant is an accomplice, the trial court must give jury instructions defining "accomplice." (E.g., CALJIC Nos. 3.10, 3.14, 3.15, 3.17.) It also must instruct that an

accomplice's incriminating testimony must be viewed with caution (e.g., CALJIC No. 3.18) and must be corroborated (e.g., CALJIC Nos. 3.11, 3.12, 3.13). If the evidence establishes that the witness is an accomplice as a matter of law, it must so instruct the jury (e.g., CALJIC No. 3.16); otherwise, it must instruct the jury to determine whether the witness is an accomplice (e.g., CALJIC No. 3.19). (*People v. Hayes* (1999) 21 Cal.4th 1211, 1270–1271 and 1271, fn. 17 [91 Cal.Rptr.2d 211, 989 P.2d 645]; see also *People v. Zapien* (1993) 4 Cal.4th 929, 982 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

"The reason most often cited in support of these instructions is that an accomplice is inherently untrustworthy because he or she 'usually testif[ies] in the hope of favor or the expectation of immunity.' [Citation.] In addition, an accomplice may try to shift blame to the defendant in an effort to minimize his or her own culpability. [Citation.]" (*People v. Tobias* (2001) 25 Cal.4th 327, 331 [106 Cal.Rptr.2d 80, 21 P.3d 758], quoting *People v. Coffey* (1911) 161 Cal. 433, 438 [119 P. 901].)

"For instructional purposes, an accomplice is a person 'who is liable to prosecution for the *identical offense* charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 142–143 [51 Cal.Rptr.2d 770, 913 P.2d 980], italics added, quoting Pen. Code, § 1111.) "In order to be an accomplice, the witness must be chargeable with the crime as a principal [citation] and not merely as an accessory after the fact [citations]. [Citation.]" (*People v. Sully* (1991) 53 Cal.3d 1195, 1227 [283 Cal.Rptr. 144, 812 P.2d 163].) Principals include those who "directly commit the act constituting the offense" as well as those who "aid and abet in its commission . . . ." (Pen. Code, § 31.) Accordingly, "perpetrators are accomplices within the meaning of section 1111 [citations] . . . ." (*People v. Belton* (1979) 23 Cal.3d 516, 523 [153 Cal.Rptr. 195, 591 P.2d 485], fn. omitted; accord, *People v. Gordon* (1973) 10 Cal.3d 460, 468 [110 Cal.Rptr. 906, 516 P.2d 298].)

"[T]he dividing line between the actual perpetrator and the aider and abettor is often blurred. It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor. When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1120 [108 Cal.Rptr.2d 188, 24 P.3d 1210].) Moreover, "the aider and abettor's guilt for the intended crime is not entirely vicarious. Rather, that guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*Id.* at p. 1117.)

The trial court relied on the general principle that "[a]n aider and abettor . . . must 'act with knowledge of the criminal purpose of the perpetrator and

with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.]" (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1123 [77 Cal.Rptr.2d 428, 959 P.2d 735], italics omitted, quoting *People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) Even the Supreme Court has said that an "accomplice" must act with such knowledge and intent. (E.g., *People v. Prettyman* (1996) 14 Cal.4th 248, 259 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) As long as the issue is vicarious criminal liability, and not the duty to give accomplice instructions, this is all well and good.

■ Under Penal Code section 1111, however, "accomplice" is not synonymous with aider and abettor; a perpetrator can be an accomplice. And, depending on the nature of the crime charged against the defendant, a perpetrator may be able to commit it without intending to do so, and without any knowledge that the defendant intends to do so. For example, the accomplice may be the perpetrator of a crime that does not require specific intent, whereas the *defendant* is the aider and abettor or *coperpetrator*.

Here, Littlefield could commit felony child endangerment without any intent that defendant commit it. This crime requires "circumstances or conditions likely to produce great bodily harm or death." (Pen. Code, § 273a, subd. (a).) It can be committed by " 'both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect.' [Citation.]" (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215–1216 [81 Cal.Rptr.2d 835, 970 P.2d 409], quoting *People v. Smith* (1984) 35 Cal.3d 798, 806 [201 Cal.Rptr. 311, 678 P.2d 886].)

■ Littlefield committed felony child endangerment, if at all, by inflicting harm indirectly—i.e., by leaving the baby with defendant. Under these circumstances, felony child endangerment requires at least criminal negligence. (*People v. Valdez* (2002) 27 Cal.4th 778, 781, 787–791 [118 Cal.Rptr.2d 3, 42 P.3d 511].) " 'Under the criminal negligence standard, knowledge of the risk is determined by an objective test: "[I]f a reasonable person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness." ' [Citations.]" (*Id.* at p. 783, quoting *Williams v. Garcetti* (1993) 5 Cal.4th 561, 574 [20 Cal.Rptr.2d 341, 853 P.2d 507].)

As the trial court correctly found, there was no evidence that Littlefield intended defendant to hurt the baby. It follows that she did not *aid and abet* the commission of felony child endangerment. Nevertheless, there was evidence that she committed felony child endangerment *as a coperpetrator*. As she did not directly inflict the harm, she did not have to know that leaving the baby with defendant could result in great bodily harm, as long as a

reasonable person would have known. Defendant had inflicted great bodily injury on the baby before. Littlefield had agreed, for the protection of her children, not to let defendant near them. Also, the baby had older, healing injuries of which Littlefield inferably might have been aware. The jury could find that a reasonable person would have known that leaving the baby with defendant presented a risk of great bodily harm. (See *People v. James* (1987) 196 Cal.App.3d 272, 284 [241 Cal.Rptr. 691] [where there was evidence that mother knew the defendant was abusing her daughter but failed to protect her, mother was accomplice to the defendant's felony child endangerment].) Finally, the likelihood that defendant would inflict great bodily harm was precisely what made Littlefield criminally negligent. She created a danger to the baby; defendant escalated this same danger to the level of actual injuries.

Accordingly, there was sufficient evidence that defendant and Littlefield were coperpetrators of the same crime. And if Littlefield was a coperpetrator, then she was an accomplice. This is true even though she was not an aider and abettor, i.e., even though she did not intend defendant to commit the crime.

At oral argument, the People argued for the first time that Littlefield committed felony child endangerment (if at all) the moment she left her baby in defendant's care; even if she had come back and found the baby unharmed, she would still have been guilty of felony child endangerment. Thus, she and defendant could not be found guilty of the "identical offense." At our request, both sides filed supplemental briefs on this point.

■ The People's argument, though appealing, is flawed. Felony child endangerment is a continuous-course-of-conduct crime. (See *People v. Culuko* (2000) 78 Cal.App.4th 307, 325 [92 Cal.Rptr.2d 789] [Fourth Dist., Div. Two].) Moreover, as we noted in *People v. Heath* (1998) 66 Cal.App.4th 697 [78 Cal.Rptr.2d 240], "an offense may have been 'committed,' so as to subject its perpetrator to liability for the completed offense as opposed to an attempt to commit it, but still remain in progress for purposes of determining aider and abettor liability. [Citation.] Thus, . . . for purposes of aiding and abetting liability a burglary continues until the perpetrator finally departs from the structure, even though the crime is technically complete upon the initial entry. [Citation.] Similarly, . . . a robbery continues for purposes of aiding and abetting until the stolen property is carried to a place of temporary safety, even though the crime is technically complete when the property is taken from the victim's person or immediate presence. [Citation.]" (*Id.* at p. 707, citing *People v. Montoya* (1994) 7 Cal.4th 1027, 1045–1047 [31 Cal.Rptr.2d 128, 874 P.2d 903] [burglary] and *People v. Cooper* (1991) 53 Cal.3d 1158, 1165–1166 [282 Cal.Rptr. 450, 811 P.2d 742] [robbery].)

Littlefield's offense was "complete," for purposes of her guilt, the moment she left the baby with defendant. However, it was not "complete," for purposes of aider and abettor liability, until she returned home. During this time, defendant became her coperpetrator by directly inflicting injury on the baby. True, Littlefield's guilt did not depend on defendant's; she would have been equally guilty, with or without his participation. But the same is true in every "late joiner" case—when the crime has already been committed by the perpetrator, but is still ongoing as to the accomplice. This fact did not preclude defendant from becoming Littlefield's coperpetrator.

We cannot say Littlefield was an accomplice as a matter of law. Defendant had been left with the children safely before; he had convinced Littlefield, by swearing on a Bible, that he had not hurt the baby. Thus, alternatively, the jury could have found that Littlefield acted reasonably and was *not* criminally negligent. Littlefield's status as an accomplice presented a question of fact. The trial court therefore erred by failing to define accomplice and by failing to instruct the jury on what to do if it found that Littlefield was an accomplice.

If the trial court had given accomplice instructions, presumably it would have given CALJIC No. 3.14. This instruction, as the trial court noted, would have stated that an accomplice must have "knowledge of the unlawful purpose of the perpetrator" and "the intent or purpose of committing, encouraging or facilitating the commission of the crime . . . ." It would have led the jury to find that Littlefield was not an accomplice.

But this does not suffice to render the error harmless. For the reasons already stated, in this case, CALJIC No. 3.14 would have been legally incorrect. The trial court's duty to instruct sua sponte "on general principles of law that are closely and openly connected with the facts presented at trial" (*People v. Ervin* (2000) 22 Cal.4th 48, 90 [91 Cal.Rptr.2d 623, 990 P.2d 506]) would have included a duty to modify or to replace this standard instruction. By giving CALJIC No. 3.14 in unmodified form, the trial court would only have replaced one error with a different error.

■ We do conclude that the error was harmless, but for a different reason. An erroneous failure to give accomplice instructions is deemed harmless as long as there is "sufficient" (or "ample") evidence of corroboration. (*People v. Lewis* (2001) 26 Cal.4th 334, 370 [110 Cal.Rptr.2d 272, 28 P.3d 34] [sufficient]; *People v. Arias, supra,* 13 Cal.4th at p. 143 [ample].) " 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]' [Citation.] The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the

accomplice is telling the truth.' [Citation.]" (*Lewis*, at p. 370, quoting *People v. Hayes, supra*, 21 Cal.4th at p. 1271 and *People v. Fauber* (1992) 2 Cal.4th 792, 834 [9 Cal.Rptr.2d 24, 831 P.2d 249].)

Here, there was more than ample evidence to corroborate Littlefield's testimony. Defendant had admitted causing similar injuries to the baby when she was left with him before. When interviewed by the police, he insisted that Littlefield "didn't do nothing to that baby, I know she didn't." He admitted that the baby was fine when Littlefield left, around 6:30 p.m., and that she was in his sole care until about 11:30 p.m., when Littlefield got back. Wallace testified that Littlefield called her around 11:00 p.m. Moreover, when Wallace asked if the baby fell, Littlefield turned to defendant, who said no. Thus, defendant implicitly admitted that the baby had been in his care, and not Littlefield's, when she was injured.

As defendant points out, the investigating officer who interviewed Wallace testified that Wallace said Littlefield called her "around 1:00 in the morning." Defendant also claims a second investigating officer testified that he arrived at the scene at 1:30 a.m., and the paramedics were still there. Defendant theorizes that Littlefield actually caused the injuries to the baby herself, between 11:00 p.m. and 1:00 a.m. Defendant's theory is inconsistent with his own insistence that Littlefield did not do it. Moreover, the second officer's testimony was far from clear; 1:30 a.m. seems to have been when he got a second call telling him that, unlike the paramedics, the emergency room physicians suspected child abuse. In any event, the Supreme Court at most requires ample corroboration, not corroboration beyond a reasonable doubt.

Finally, as we will discuss in an unpublished portion of this opinion, defendant's efforts to flee after the crime were relevant and admissible to show consciousness of guilt. "Flight tends to connect an accused with the commission of an offense and may indicate that an accomplice's testimony is truthful. [Citations.] As such, the flight of one who knows he is suspected of committing a crime may be sufficient to corroborate the testimony of an accomplice. [Citation.]" (*People v. Perry* (1972) 7 Cal.3d 756, 771–772 [103 Cal.Rptr. 161, 499 P.2d 129]; accord, *People v. Garrison* (1989) 47 Cal.3d 746, 773 [254 Cal.Rptr. 257, 765 P.2d 419].)

Defendant argues that this error was also prejudicial with respect to his conviction of attempted criminal threat. As he notes, Littlefield was the only witness who could testify that he threatened her. With respect to this offense, however, Littlefield was not an accomplice; she was the victim.

■ Penal Code section 1111, by its terms, is offense-specific. It defines an accomplice as "one who is liable to prosecution for *the identical offense*"; to support "*[a] conviction*," it requires that the accomplice's testimony be corroborated by evidence "tend[ing] to connect the defendant with the commission of *the offense* . . . ." (Italics added.) For example, in *People v. Tenner* (1944) 67 Cal.App.2d 360 [154 P.2d 9], the evidence showed that a prostitute orally copulated the defendant, but she resisted when he tried to sodomize her. The appellate court reversed the defendant's oral copulation conviction, on the grounds that the prostitute was an uncorroborated accomplice. However, it affirmed his attempted sodomy conviction, noting: "The evidence relating to the second count . . . presents a different kind of case. [A]fter the other acts were committed the appellant attempted an act of sodomy. The resistance of the prosecutrix and her prevention of the act removed her from the role of an accomplice . . . ." (*Id.* at p. 363; accord, *People v. Boyce* (1980) 110 Cal.App.3d 726, 736 [168 Cal.Rptr. 219] [testimony of the defendant's accomplice in sale of stolen property did not require corroboration as to initial receiving of the property]; *People v. Wynkoop* (1958) 165 Cal.App.2d 540, 546 [331 P.2d 1040] [testimony of the defendant's accomplice in first burglary did not require corroboration as to second and third burglaries].)

■ Defendant argues that, if Littlefield was an accomplice to felony child endangerment, she had a motive to "make [him] look as bad as possible" on both counts. Be that as it may, the bare existence of such a motive is insufficient to trigger the corroboration requirement. Indeed, this is a corollary of the rule that Penal Code section 1111 is offense-specific. Similarly, a person who has committed a related but not identical offense need not be corroborated (*People v. De Paula* (1954) 43 Cal.2d 643, 648 [276 P.2d 600]), even though he or she may be trying just as hard as an accomplice would to curry favor or to shift blame.

In a single sentence, defendant asserts: "The admission of accomplice testimony without cautionary instruction[s] allowed the prosecution to convict [defendant] using unreliable evidence, [in] violation of the [d]ue [p]rocess [c]lause." Defendant waived this argument by failing to support it with citation to authority and reasoned argument. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) In any event, the corroboration requirement itself is a matter of state law, not due process. (*In re Mitchell P.* (1978) 22 Cal.3d 946, 949; *In re Eugene M.* (1976) 55 Cal.App.3d 650, 657; *In re R.C.* (1974) 39

Cal.App.3d 887, 893.) A fortiori, when there is sufficient corroboration, the failure to give accomplice instructions does not violate due process. (*People v. Frye* (1998) 18 Cal.4th 894, 966; *People v. Arias* (1996) 13 Cal.4th 92, 143.)

We conclude that, although the trial court erred by failing to give accomplice instructions, reversal is not required.

### III–V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### VI

### DISPOSITION

The judgment is affirmed.

Hollenhorst, Acting P. J., and Gaut, J., concurred.

A petition for a rehearing was denied October 13, 2004, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied December 1, 2004.

---

*See footnote, *ante*, page 260.