Filed 1/22/15  P. v. Basquez CA2/6

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>IRVIN ALLAN BASQUEZ,<br><br>    Defendant and Appellant. | 2d Crim. No. B254537<br>(Super. Ct. No. 1432885)<br>(Santa Barbara County) |

Irvin Allan Basquez appeals from the judgment entered after a jury convicted him of willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 664, 187, subd. (a))[1] and burglary of the first degree.  (§§ 459, 460.)  The jury found true allegations that appellant had personally inflicted great bodily injury (§ 12022.7, subd. (a)) and had personally used a deadly weapon (a knife).  (§ 12022, subd. (b)(1).)  The jury also found true one prior conviction of a serious or violent felony within the meaning of California's "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)); one prior prison term (§ 667.5, subd. (b)); and one prior conviction of a serious felony within the meaning of section 667, subdivision (a)(1).  Appellant was sentenced

---

[1] All statutory references are to the Penal Code unless otherwise stated.

1

to prison for a determinate term of 10 years followed by an indeterminate term of 14 years to life.

In his opening brief appellant states: "[I]t was undisputed that someone stabbed the victim [Dustin Randolph] . . . . The issue at trial was whether appellant [or another unidentified person] committed this offense." Appellant contends that the trial court erroneously failed to sua sponte instruct the jury that the testimony of an accomplice must be viewed with caution and corroborated by other evidence. In addition, appellant contends that the court erroneously admitted evidence of a BB gun that was found in his possession two days after the stabbing. We affirm.

*Facts*

In January 2013 Christopher Thomas, Jarred Syslo, and Steven Sorheim were passengers in a Ford Escort that was being driven by Cameron Taylor. Taylor picked up appellant, who said that he wanted to go to Dustin Randolph's house. At trial Thomas testified that, on the way there, appellant "seemed really disturbed, like something was wrong." Thomas and Sorheim "kept saying what's going on dude, what's going on?" Appellant replied, " '[J]ust take me over there, just take me over there.' " Taylor did so and parked the Escort at the entrance to a cul-de-sac. It was about 7:00 p.m. Appellant got out of the vehicle and walked alone to Randolph's house, which was at the end of the cul-de-sac. Appellant was greeted by Randolph and then stabbed Randolph 9 times.

Two days after the stabbing, Thomas told Detective Matt Fenske a different version of what had happened inside the Escort. Thomas said that, when appellant entered the car, he was " 'fucking livid.' " Appellant "was telling everyone in the car that he was going to take out everyone at [Randolph's] house." Appellant said, " 'I don't give a fuck. I'm going to hurt some motherfuckers over here. That's it.' " Appellant "had a semi-automatic weapon between his legs" and was "racking" the slide of the firearm back and forth. Appellant said that "he was going to shoot them up." Thomas "was trying to talk sense into [appellant] during this whole time." Upon arriving at the

2

cul-de-sac where Randolph lived, appellant said: " 'I don't give a fuck. I'm going to hurt everybody in this fucking house.' " Appellant then "pulled out a semi-automatic handgun, racked it and stated, . . . 'I'm going to hurt all you motherfuckers.' " Thomas "wanted to leave," but an "occupant of the car that [Thomas] could not name got out of the car and stood in the middle of the street and said nobody was going to go anywhere." After appellant walked to Randolph's house, Thomas heard appellant yell, " '[W]here is my gun?' " A voice replied, " 'Barbara has it, bitch.' "[2]

Steve Sorheim, one of the passengers in the Escort, told a deputy sheriff that he knew Randolph was a heroin dealer. "When he heard that they were going to [Randolph's] house, he thought it was for the purpose of buying narcotics."

Bobby Dean Loftin and Shawna Bagnall were living with Randolph at the house. Randolph was Bagnall's boyfriend, and Loftin was the owner of the house. Loftin testified that he was asleep when he heard a male voice outside call, " '[H]ey, Dustin,' " Randolph's first name. Loftin yelled to let Randolph know that someone at the front door wanted to see him.

Randolph went to the front door and started to open it. "Somebody pushed the door open and it hit" Randolph, knocking him to the ground. The intruder stabbed Randolph nine times.

Bagnall testified: She heard a scuffle and saw "a figure hanging over" Randolph. The figure was "dark," and she did not see his face. Bagnall ran to the kitchen to grab the kitchen knives. When she returned to the front door, the intruder was gone. Randolph said appellant's name, but "he was asking [Bagnall] to call for [appellant]."

Contrary to her trial testimony, on the night of the stabbing Bagnall told sheriff's deputies that appellant had stabbed Randolph. Bagnall testified that she had identified appellant as the stabber because "I thought that's what Dustin had said and I was wrong." Bagnall knew appellant and had met him several times. When the police asked

---

[2] The question regarding the gun may have been the motivating factor for the attack. (See, *infra,* p. 7.)

Bagnall if she would be willing to testify at trial, "she indicated she had to check with Dustin."

Randolph testified: He has known appellant all of his life. Appellant is like a father to him. Prior to the stabbing, he had no problems with appellant. Randolph does not know the identity of the person who stabbed him, but he is "[a]bsolutely" certain that appellant was not the stabber.

Approximately two months after the stabbing, Randolph told Deputy Sheriff Jeffrey McDonald, " 'I'm going to put him [appellant] away for the rest of his life.' " Randolph referred to appellant by his first name, "Irv." Randolph "volunteered that everyone was telling him it was over drugs but it was just some mistake in Irv's head." Randolph "complained to [McDonald] that he didn't want [appellant] over at his house around the time of the stabbing because he had just gotten out of prison and was staying clean . . . ." Randolph described how the stabbing had occurred: " 'Irv tried to get me in the neck and femoral.' " Randolph also said that that "Irv tried to stab Shawna [Bagnall]." Randolph "then said . . . he thought Irv was going to kill him and he was only able to stop the attack when he . . . 'smashed him in the nose and blood started pouring out.' " Deputy McDonald wrote in his report: " 'Randolph believed that [appellant] fled his residence because of the DNA that would be left behind from his bloody nose.' "

Toward the end of the interview with McDonald, Randolph "start[ed] backing away" from his previous statements. "[H]e made a statement that he couldn't confirm it was [appellant], that that's just what he was told." Randolph said, " 'I was in a blackout at the time the stabbing occurred.' " Randolph also said that, "when they arrested [appellant], he assumed it must have been him because they must have found his DNA all over the house."

After the stabbing, appellant ran to the Escort that was parked at the entrance to the cul-de-sac. Thomas, who was inside the car, told Detective Fenske that he had seen appellant wipe a knife on his leg. The knife was bloody. Appellant entered the car and

4

said that he had " 'booked Dustin six or seven times.' "  Thomas explained that "booked" was slang for "stabbed."

Syslo told a deputy sheriff that, "[w]hen [appellant] got in the car, he said, 'go, go, go."  They all drove to Nick Myer's house.  Sorheim told Detective Morris that Thomas said he had "washed blood off a knife" and that "he was going to help get rid of a knife."

*Instruction on Accomplice Testimony*

Appellant asserts, "The critical factual question in this case was whether it was appellant who stabbed Randolph . . . ."  Appellant notes that, although the four witnesses in the Escort did not see the stabbing, "they all [testified and] placed appellant at or near Randolph's house that night."  Appellant argues that there is substantial evidence that the four witnesses - Thomas, Sorheim, Syslo, and Taylor - were accomplices.  Therefore, "the trial court had a sua sponte duty to instruct the jury regarding accomplice testimony."

"When a jury receives substantial evidence that a witness who has implicated the defendant was an accomplice, a trial court on its own motion must instruct it on the principles regarding accomplice testimony.  [Citation.]  This includes instructing the jury that an accomplice's testimony implicating the defendant must be viewed with caution and corroborated by other evidence.  [Citations.]"  (*People v. Houston* (2012) 54 Cal.4th 1186, 1223.)

"An accomplice is someone subject to prosecution for the charged crimes by reason of aiding and abetting or being a member of a conspiracy to commit the charged crimes.  [Citations.] . . . [A]n aider and abettor must act 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.'  [Citation.]  In other words, an aider and abettor of a specific intent crime shares the perpetrator's specific intent when he or she knows of the perpetrator's criminal purpose and aids, promotes, encourages, or

5

instigates the perpetrator with the intent of encouraging or facilitating the commission of the crime. [Citation.]" (*People v. Houston, supra,* 54 Cal.4th at p. 1224.)

Based on Thomas's statements to Detective Fenske there was some evidence that the four witnesses knew of appellant's criminal purpose. Thomas said that appellant "was telling everyone in the car that he was going to take out everyone at [Randolph's] house." We need not decide whether there is substantial evidence that any of the four witnesses intended to facilitate the commission of the crimes. Even if there is substantial evidence, not giving a sua sponte instruction on accomplice testimony was harmless error.

" 'A trial court's failure to instruct on accomplice [testimony] . . . is harmless if there is sufficient corroborating evidence in the record.' [Citation.] 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense.' [Citation.] The evidence is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*People v. Gonzales* (2011) 52 Cal.4th 254, 303.) "[*I*]*n the absence of sufficient corroboration* we will submit the omission of accomplice instructions to the harmless error analysis for state law error under *People v. Watson* [(1956) 46 Cal.2d 818, 836]." (*Id.*, at p. 304.) *Watson* "requires reversal if, after an examination of the entire case, 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Id.*, at p. 303.) "[T]he corroboration requirement itself is a matter of state law, not due process. [Citations.] A fortiori, when there is sufficient corroboration, the failure to give accomplice instructions does not violate due process. [Citations.]" (*People v. Felton* (2004) 122 Cal.App.4th 260, 273-274.)

Here, the corroborating evidence consists of statements by Randolph and Bagnall and their housemate, Loftin. Approximately two months after the incident, Randolph told Deputy McDonald that appellant had stabbed him. We recognize that, toward the end of the interview with McDonald, Randolph reversed course and "made a statement

6

that he couldn't confirm it was [appellant], that that's just what he was told." Randolph said, " 'I was in a blackout at the time the stabbing occurred.' " But the jury could have reasonably concluded that Randolph was lying. If he had been "in a blackout," he could not have remembered that "Irv tried to get [him] in the neck and femoral." Nor could he have remembered other details of the incident, such as that "he was only able to stop the attack when he . . . 'smashed [appellant] in the nose and blood started pouring out.' " In view of Randolph's close relationship with appellant, he surely would have known whether appellant was his assailant. Bagnall testified that after the stabbing Randolph had said appellant's name but "he was asking [her] to call for [appellant]." It is reasonable to infer that Randolph said appellant's name because he recognized appellant as his assailant. Randolph needed to call for paramedics, not for appellant.

Randolph's identification of appellant is supported by Loftin's statements. The night of the stabbing, Loftin told a deputy sheriff that he had heard Randolph say "it [the stabber] was either Herb or Irv." Later that same night at the sheriff's station, Loftin told a detective that appellant "had stabbed Dustin because Dustin gave back a derringer gun that [appellant] had stolen from his girlfriend's landlord." This explains why Thomas heard appellant yell outside Randolph's house, " '[W]here is my gun?' " At trial Loftin testified that, when he heard someone outside call, "Hey, Dustin," he "thought it [the person calling] could have been [appellant]," although "[i]t could have been a few different people."

Bagnall saw the stabber. Randolph told Deputy McDonald that "Irv tried to stab [her]." Bagnall knew appellant well. Loftin testified that he "couldn't count all the times" that appellant had visited his house in the cul-de-sac. Appellant had "hung out with [Loftin] and Dustin and Shawna [Bagnall]." He had even "cooked dinner for everyone at the house." On several occasions, he had spent the night there. On the night of the stabbing, Bagnall told sheriff's deputies that appellant had stabbed Randolph. At trial Bagnall testified that that she was unable to see the stabber's face

7

and did not know who he was. But the jury could have reasonably concluded that she had told the truth on the night of the stabbing.

" 'Corroborating evidence may be slight . . . .' " (*People v. Gonzales*, *supra*, 52 Cal.4th at p. 303.) Randolph's, Bagnall's, and Loftin's statements constitute ample corroborating evidence. Thus, any error in the trial court's omission of the instruction on accomplice testimony was harmless. (*Id*., at pp. 303-304.)

*Admission of Evidence of a BB Gun*

Appellant maintains that the trial court erroneously admitted evidence of a BB gun that was "recovered from the vehicle in which he was an occupant" at the time of his arrest two days after the stabbing. Appellant concedes that "[t]he BB gun was arguably in a location where appellant could have possessed it, and a subsequent forensic analysis determined that it contained appellant's DNA." Appellant argues that evidence of the BB gun should have been excluded because it lacked relevance and its "prejudicial effect outweighed any probative value." "We review for an abuse of discretion the trial court's rulings on the admissibility of evidence. [Citation.]" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1095.)

The trial court did not abuse its discretion. Evidence of the BB gun was relevant to corroborate Thomas's and Taylor's statements that they had seen appellant in possession of a firearm on the night of the stabbing. The BB gun was a replica of a Walther semi-automatic firearm. It had a slide that "will go back and make [a] racking sound, metal on metal." The BB gun had the "full weight" of and was indistinguishable from a real handgun. Thomas said that, on the way to Randolph's house, appellant "had a semi-automatic weapon between his legs" and was "racking" the slide of the firearm "back and forth." Thomas also said that, upon arriving at the cul-de-sac where Randolph lived, appellant "pulled out a semi-automatic handgun, racked it and stated, . . . 'I'm going to hurt all you motherfuckers.' " Taylor testified that, when he dropped appellant off at Nick Myer's house after the stabbing, appellant pulled a pistol out of his back pocket, "put the slider back and a bullet popped out of it."

8

The trial court reasonably concluded that the probative value of the evidence of the BB gun was not substantially outweighed by its prejudicial impact.  (Evid. Code, § 352.)  Appellant's possession of a BB gun had little, if any, prejudicial impact because evidence was before the jury that appellant had displayed a real handgun on the night of the stabbing.  The BB gun mitigated the prejudicial impact of this evidence by tending to show that the handgun displayed by appellant was not a lethal firearm but was merely a BB gun.

If the trial court had erred in admitting evidence of the BB gun, the error would have been harmless.  The evidence against appellant was overwhelming.  It is not reasonably probable that a result more favorable to appellant would have been reached if evidence of the BB gun had been excluded.  (*People v. Watson, supra*, 46 Cal.2d at p. 836.)

*Disposition*

The judgment is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.


We concur:


GILBERT, P.J.


PERREN, J.


9

Rogelio Flores, Judge

Superior Court County of Santa Barbara

_____

Mark R. Feeser, under appointment by the Court of Appeal for Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Rma R. Maline, Deputy Attorney General, for Plaintiff and Respondent.