Filed 11/4/21  P. v. Nery CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTONIO NERY,<br><br>    Defendant and Appellant. | B305395<br><br>(Los Angeles County<br>Super. Ct. No. VA140178) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Olivia Rosales, Judge.  Affirmed.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Antonio Nery of first degree murder, unlawful possession of a firearm by a felon, and unlawful possession of ammunition by a felon. The jury also found true that appellant personally used and discharged a firearm causing great bodily injury or death (Penal Code[1] § 12022.53, subd. (d)) and that he had suffered a prior serious felony conviction within the meaning of section 667, subds. (b)-(i) and the Three Strikes Law (§ 1170.12, subds. (a)-(d)).

At sentencing the trial court dismissed the prior conviction findings in the interest of justice, but declined appellant's request to dismiss the firearm finding. Appellant was sentenced to 50 years to life in prison (25 years to life for the murder plus 25 years to life for the use of the firearm). The trial court stayed imposition of sentence on the remaining counts pursuant to section 654.

Appellant raises two issues on appeal. Appellant contends the trial court erred when it allowed the jury to decide whether two eyewitnesses were, in fact, accomplices to the murder. Then, invoking the rule that accomplice testimony must be independently corroborated to be admissible, appellant contends the People presented insufficient evidence connecting him to the shooting itself, thereby rendering inadmissible the testimony of the two eyewitnesses he alleges were accomplices to the shooting.

---

[1]    Undesignated statutory references are to the Penal Code.

# FACTUAL AND PROCEDURAL BACKGROUND

A.  ***The People's Evidence at Trial***

Appellant and murder victim Carlos O. were co-workers at Mao Foods, a chicken processing plant. Rudy Perez supervised both of them at Mao Foods. Appellant was hostile towards his co-worker Carlos O., referring to him as "a faggot." Their supervisor Perez, however, was a friend of Carlos O., so much so Perez let Carlos O. stay at his home when he did not have a place to live.

Appellant lived on 71st Street just east of Central Avenue in South Los Angeles. Jorge Loya grew up in the same neighborhood and had known appellant for 10 years, since they were teenagers.

Both Perez and Loya were eyewitnesses to the crime and testified at trial that appellant committed the murder. Neither Perez, appellant's work supervisor, nor Loya, his neighborhood acquaintance, considered appellant a friend. Perez believed appellant could be very aggressive. Indeed, a few days before the shooting, Perez gave appellant a ride home from work. Appellant took a baseball equipment bag from Perez's car and Perez was afraid to confront him about the theft. Similarly, Loya believed appellant was a bully who intimidated and beat him. Appellant would demand favors from Loya, such as giving him rides, and Loya would comply out of fear.

On the afternoon of the murder, Perez gave appellant a ride home after meeting with him about his absence from work that day and then getting lunch with him. Appellant's neighbor, Marco Moreno, had three surveillance cameras mounted on his home. The cameras captured an image of a man, identified as appellant by Perez and Loya, exit the passenger side of Perez's blue Dodge Charger on 71st Street. The video showed the man

3

wore a dark t-shirt with a large, light-colored print purportedly of the face of "El Chapo."  The man crossed the street, approached a woman on the property next door to appellant's home, and then returned to Perez's car.

The cameras then recorded the same man, this time identified as appellant by Moreno, standing on the sidewalk in front of Moreno's home, speaking to Moreno's brother-in-law, and eventually speaking to Moreno.  Perez and appellant then went into Moreno's backyard to hang out next to an exercise area.  Perez had to move a rifle out of his way to sit down.  He later left alone to return to work.  Appellant later told police he worked out at Moreno's house that afternoon.

That night Perez and victim Carlos O. planned to attend a barbeque at a home near Moreno's on 71st Street.  At some point Perez told appellant he was bringing Carlos O. to the party.  Appellant asked, "Why are you bringing that faggot over?"  Shortly after midnight on the night of the party, Loya was hanging out at Moreno's home.  Appellant was there and asked Loya for a ride.  Moreno's surveillance cameras captured appellant, carrying a long, dark-colored duffel bag, walking from a neighbor's driveway to the sidewalk in front of Moreno's home.  Loya met appellant on the sidewalk and they both walked to Loya's distinctive car, a Lincoln Towncar.  Appellant was wearing the "El Chapo" shirt shown in the earlier afternoon recording.  Both men entered the car, which Loya drove west on 71st Street out of sight of the camera.  Moreno again identified appellant on the video as the person getting into and out of the car, but for these frames, he could not be positive.  He testified the person who got into the car "looks like" appellant by size and shape.

4

About 40 seconds later, the camera captured Loya's car returning from the west and driving east on 71st Street past Moreno's home. The car pulled into the driveway of Moreno's neighbor and both men exited. Appellant was using a phone before both men re-entered the car. Loya drove west, again passing in front of Moreno's house. Past Moreno's house is an alley that opens onto 71st Street. Loya testified appellant directed him to stop at the mouth of the alley.

Earlier, as Perez was en route to the party with Carlos O., appellant had called and told Perez not to park on 71st Street as he had that afternoon. So Perez parked one block north on 70th Street at the corner of the alley. He and Carlos O. began walking down the alley to 71st Street. Ahead, Perez saw a car stop at the mouth of the alley. As Perez and Carlos O. walked, Dolores Williams was also walking alone down the alley towards 71st Street. She, too, saw the car stop. She saw it first drive past the alley, then back up and drive forward again as if to line up the front passenger seat with the alley's entrance.

After Loya stopped the car, appellant exited and removed an AK-47 out of Perez's baseball equipment bag, which the video camera recorded him previously putting in the car. Loya testified he did not notice the bag when appellant got into the car, although he had earlier told police he saw the bag but did not know what it contained. Perez saw appellant exit the car. Appellant then started shooting into the alley. Perez heard appellant shout "fuck you" as he shot at them.

Dolores Williams heard the shots, too. She thought they came from inside the car as she recalled a window went down and the shooter pointed the rifle out the window as he shot. All three individuals were near the mouth of the alley. Perez froze at the

5

start of the shooting.  Williams pulled Perez out of harm's way and started to run towards some cars parked on 71st Street to take cover.  She also heard the sound of a car door close.

As appellant was shooting, Perez saw the car drive away, leaving appellant behind.  Loya, the driver, testified he had no idea appellant was going to start shooting; he did not know Perez or Carlos O.; he did not work at Mao Foods; and when the shooting started, he panicked and fled.  A surveillance camera on a nearby commercial building recorded his car turning right from 71st Street onto Central Avenue, which was a few hundred feet from the alley.

Carlos O. was hit twice.  He was killed instantly.

A bit more than a minute after Loya was recorded driving away west on 71st Street right before the shooting, Moreno's cameras captured a man, whom Moreno testified looked like appellant but he couldn't be sure, running from the west up a neighbor's driveway.

After the shooting, neither Perez nor Loya called the police.  Loya locked himself in his house, afraid he would be implicated in the shooting.  Afraid of appellant, Perez did nothing.  The next day appellant called Perez to tell him to remain silent about what he saw.

Police responded to the scene of the shooting and found five expended casings consistent with bullets being discharged from an AK-47 assault rifle.  They also found a live AK-47 round and the equipment bag in the street.  The bag contained a full AK-47 ammunition magazine and three loose rounds as well as some athletic gear.  Police never recovered the rifle nor did they recover the actual bullets that hit Carlos O. because they were lodged inside the wall of a residence.

Perez's DNA was found on some of the athletic equipment inside the bag, on the individual rounds, and on the bag's zipper pulls and handle. A possible mixture of DNA from Perez and appellant was found on the ammunition magazine. DNA was found on the bag's zipper pulls and handles from two unknown contributors. Loya's DNA was not found.

Police interviewed Perez and Loya, who both eventually identified appellant as the shooter, after denying knowing about the murder.

Appellant told police he was at Moreno's house the day of the shooting and had worked out. When police told him they were unsure if they believed him, appellant replied, "because to my knowledge I didn't—I mean it wasn't me."

B.      ***The Defense Case***

Appellant cross-examined the People's witnesses; he called no witnesses on his behalf.

Through cross-examination, appellant presented the following evidence to the jury.

Both Loya and Perez testified under grants of immunity. Loya testified that during the first 40 second-long drive west on 71st Street, he gave appellant a ride to a liquor store on Central Avenue. He waited in the car while appellant bought cigarettes. This story was contradicted by the timeline in the Moreno videos and the absence of his car from videos taken along the route to the liquor store during the same time span. Loya testified he then drove appellant back to the house next to Moreno's home and pulled into the driveway, as shown on the videos. He had, however, initially given police a false alibi, placing himself at another location. He only admitted being at Moreno's house when confronted with Moreno's surveillance videos. Loya

7

admitted the police led him to believe he could avoid liability by identifying appellant as the shooter. He initially told police he dropped appellant off at the alley and left before the shooting-- also contradicted by Dolores Williams. The equipment bag Loya initially said he did not notice was placed in the front seat of the car Loya was driving, according to the Moreno videos.

Loya admitted to police that he lined up the car at the front of the alley and then added that appellant threatened to hit him if he did not do so. He testified at trial that he did not recall backing up the car.

As for Perez, although he and Carlos O. were friends and Carlos O. was "like my brother", he had recently had a significant falling out with Carlos O., demanding that he move out of the house because he was using drugs around Perez's children. Perez also fired Carlos O. because of his drug use. Perez claimed Carlos O. called him for a ride to the party, even though Carlos O. had no connection to the 71st Street neighborhood. Perez himself had driven appellant home on more than one occasion. He never asked for his equipment bag back, even when he came across it on the day of the murder. He continued to associate with appellant, whom he said he feared. He did not advise police that appellant had stolen his bag until police told him the bag was found at the scene of the shooting. Perez's DNA was all over the contents of the bag, including the ammunition in the magazine.

Perez initially told police he was present in the alley but could not identify the shooter. After the police told him about his own potential criminal liability, he identified appellant as the shooter. Four months before the shooting, Perez had suffered a conviction for carrying a concealed firearm in his vehicle.

8

However, he told police, "I don't know guns" and "never use them."

The alley was 15 feet, 10 inches wide, about the width of two cars. Dolores Williams testified that although Perez and Carlos O. were in the alley together, they were on opposite sides of the roadway, "not close together." Despite saying Carlos O. was his friend, Perez left Carlos O. in the alley after the shooting and simply "walked to my car" and drove away, saying he "went back to work" shortly after midnight. Perez stated he tried to call Carlos O. after the shooting; Carlos O.'s phone showed no telephone calls from Perez after the shooting.

## C. *Jury Instruction*

While settling jury instructions, the trial court expressed its belief that both Loya and Perez were accomplices to the murder. However, it found the evidence in dispute on the issue and therefore instructed the jury that it had to determine the issue of Perez and Loya's accomplice liability. If the jury determined Perez and Loya were accomplices, then the jury could not rely on their testimony to convict appellant unless their testimony was supported by independent evidence that tended to connect appellant with the commission of the crime. This was CALCRIM No. 334. The jury was so instructed and convicted appellant. But because there was no special verdict, it is unknown how the jury reached its decision, that is, whether it found Perez and Loya were not accomplices or whether it found Perez and Loya were accomplices whose testimony was corroborated by independent evidence.

9

## DISCUSSION

A.    ***The Trial Court Properly Instructed the Jury with CALCRIM No. 334 as the Evidence Did Not Permit a Single Inference of Accomplice Liability.***

Appellant argues that CALCRIM No. 334 was given in error because the evidence permitted only one reasonable conclusion:  that Loya and Perez were accomplices to the murder.  (*People v. Sully* (1991) 53 Cal.3d 1195, 1227 [accomplice status is a question of fact for the jury unless the evidence permits only a single inference].)  We reject appellant's argument.

Although there were plenty of impeachable moments as set out above, we conclude the issue of whether Loya and Perez were accomplices was reasonably debatable such that more than a single inference could be drawn from the evidence.  Perez had just met with appellant about missing work that day, possibly explaining why the shooter yelled "fuck you" as he opened fire.  Regardless of the distance between Perez and Carlos O. as they walked down the alley, Perez was still subject to injury as appellant shot five rounds into the narrow alley.  Williams testified Perez froze when the shots rang out and she had to pull him out of harm's way; freezing presumably could have been prompted by surprise and fear or clever self-preservation.  Perez testified appellant call him the next day to silence him with threats.  These facts alone, if believed by the trier of fact, raise an inference that Perez was not an accomplice to the murder.

Similarly, Loya's status as an accomplice was open to debate.  According to Williams, Loya's headlights were off when the shooting began.  Loya drove off after the shooting, leaving the shooter to fend for himself.  These facts prompt the question whether Loya was a loyal accomplice or a surprised and

10

frightened dupe. Loya knew none of the other players (Perez and Carlos O.) and had no connection with them or their workplace. There was no evidence he stood to gain anything from knowingly helping appellant out. And his testimony that appellant was a bully was corroborated by Dolores Williams who recognized appellant at trial as the man in the neighborhood who had harassed her and her spouse many years before. Indeed, she was called back to the stand to so testify after she revealed her epiphany to the investigating agents upon leaving the witness stand.

Loya's inconsistent statements could have been the result of duplicity caused by guilt or duplicity caused by fear. In any event, given the possible inferences that could have been drawn from all the evidence, we conclude the trial court did not err in giving the issue of Perez and Loya's accomplice liability to the jury to decide.

B.   ***Assuming Loya and Perez Were Accomplices, Their Testimony was Sufficiently Independently Corroborated.***

1.   *Standard of Review*

The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32–33; *People v. Szeto* (1981) 29 Cal.3d 20, 26–27 [upholding jury's implied finding that accomplice testimony was sufficiently corroborated because the corroborating evidence was properly admitted and reasonably tended to connect defendant with the

11

crimes].) Here appellant does not contend evidence was improperly admitted; he contends the independent evidence was insufficient to connect him with the murder.

  2.  *Applicable Law*

Section 1111 provides that the testimony of an accomplice must be independently corroborated by evidence that tends to connect the defendant with the commission of the offense. Accomplice testimony poses reliability questions and it is itself insufficient as a matter of law to support a conviction. (*People v. Romero and Self*, *supra*, 62 Cal.4th at p. 32.)

Corroboration is insufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is defined as "one who is liable for prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111; see *People v. Felton* (2004) 122 Cal.App.4th 260, 268, 273.) However, the required corroboration may be entirely circumstantial, slight, and entitled to little consideration when standing alone. (*People v. Abilez* (2007) 41 Cal.4th 472, 505.) Every fact in the accomplice's testimony need not be corroborated and every element of the crime need not be corroborated. (*People v. Davis* (2005) 36 Cal.4th 510, 543.) A defendant's own statements or conduct may provide adequate corroboration for accomplice testimony as may the entire conduct and relationship of the parties. (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128.) Although the corroborating evidence must do more than raise a conjecture or suspicion of guilt, it is sufficient if it tends in some degree to implicate the defendant. (*People v. Henderson* (1949) 34 Cal.2d 340, 342–343.) For example, a false alibi, flight, or a defendant's false and contradictory statements in relation to the

charge are themselves corroborative evidence. (*People v. Santo* (1954) 43 Cal.2d 319, 327.) Similarly, independent evidence of motive and opportunity to commit the crimes is corroborative. (*People v. Szeto*, *supra*, 29 Cal.3d at p. 28.)

Assuming Loya and Perez were accomplices, we conclude there is sufficient independent evidence tending to connect appellant to the crime. Moreno identified appellant as the person in the El Chapo t-shirt who hung out in his backyard on the afternoon of the murder. They had exercised together before in his backyard and appellant was a neighbor whom he had known for a number of years. Along the same lines, appellant admitted to being at Moreno's house on the day of the shooting, which corroborated Moreno's identification of him as the person in the El-Chapo t-shirt.

Moreno also identified appellant, albeit not 100 percent positively (it "looks like him" from his "size"), as the person who later that night got into and out of Loya's car before the murder. He identified Loya as the person with appellant walking back and forth on the sidewalk in front of his yard. The surveillance videos captured Loya's car traveling back and forth in front of Moreno's property shortly before the murder right after appellant entered the car. Appellant is seen in the video on a telephone call in front of Moreno's property shortly before the murder and getting into Loya's car with the equipment bag. Videos retrieved from a neighboring commercial establishment recorded Loya's car turning the corner at 71st and Central, one-half block from the murder scene, one minute after the murder. Moreno testified that the person running through the neighborhood in the videos right after the murder "looks like Mr. Nery."

Loya's cell phone had three messages from appellant on it the next day, two of which were texts which said, "call me." The Moreno video shows the man identified as appellant carrying the equipment bag as he enters Loya's car before the drive west on 71st Street before the murder. Then, there are appellant's own actions. By his own admission, after the murder, he destroyed his phone.

The independent evidence establishes directly and circumstantially that appellant had the opportunity and means to commit the murder. According to Moreno and Williams, he had lived many years in the neighborhood, allowing the inference that he was familiar with the alley where the murder took place. According to Williams, the car with the shooter was "similar" to a photograph of Loya's car and the rifle she saw resembled an AK-47. According to the Moreno videos and Moreno's identification, appellant was in the neighborhood right before the murder and recorded running away from the direction of the alley right after the murder. Someone using his phone left text messages to "call me" on Loya's phone on the morning after the murder, allowing the inference that appellant called about covering up his participation in the murder. Right before the murder he was recorded putting the bag later found at the scene of the murder with AK-47 ammunition in Loya's car. The murder was committed with bullets compatible with AK-47 rifles. Appellant's DNA was possibly mixed with Perez's on the AK-47 ammunition in the bag. That appellant destroyed his phone after the murder supports the inference that he was trying to hide incriminating evidence on the phone.

Appellant argues that the video evidence was too vague, blurry, and dark to be reliable. In particular, he argues that the

14

El Chapo t-shirt appellant wore in the afternoon could not be clearly seen on the nighttime videos, rendering any nighttime identification based on the t-shirt unreliable. However, Moreno had known appellant for many years and based his nighttime identification not on the t-shirt, but on appellant's shape and size, not an unreasonable point of identification given that they worked out together in Moreno's backyard.

We conclude the independent evidence is sufficient to corroborate Perez's and Loya's testimony.

### DISPOSITION

The judgment is affirmed.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

STRATTON, Acting P. J.

We concur:

WILEY, J.

OHTA, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15